KENNETH E. EWING, RESPONDENT, v. KANSAS CITY, MISSOURI ET AL., APPELLANT.—180 S. W. (2d) 234.

Kansas City Court of Appeals. April 3, 1944.

*William E. Kemp* and *Arthur R. Wolfe* for appellants.

*Roger C. Slaughter* for respondent.

BLAND, J.—This is a suit in equity brought by the plaintiff, as a taxpayer, on behalf of himself and all others similarly situated, to enjoin The City of Kansas the members of the City Council, the Mayor and other officials, from using, or permitting the use, of a plot of ground, in said City, known as the "Old Convention Hall Site" for parking lot purposes, and from carrying out the terms of an alleged illegal and void ordinance.

The Chancellor granted to the plaintiff certain relief, hereinafter described, and the defendants appealed to the Supreme Court on the theory that that court had jurisdiction, but that Court held otherwise and transferred the cause here. [See Ewing v. Kansas City et al., 169 S. W. (2d) 897.]

The facts show that on May 26, 1931, by a special bond election in Kansas City, a bond issue was authorized "to pay the City's share of the cost of the acquisition of the necessary lands for the opening, widening and establishing of trafficways and boulevards in the city and the improvement of the same for travel, including the necessary bridges and viaducts."

From the proceeds of this bond issue, the City, on June 28, 1935, acquired a tract of land referred to as the "Old Convention Hall Site", being approximately the west two-thirds of the block immediately north of the Municipal Auditorium in Kansas City, said tract of land and the site of the Municipal Auditorium being separated by 13th Street. The tract remained unused and there were many suggestions and plans, by city officials, as to what improvement and use should be made thereof, among which, were a public park, a public parking station or lot and improvements that would afford a landscaping project, sidewalks and space for the parking of a large number of automobiles.

Finally, on April 14, 1941, the City Council passed Ordinance #6576, by the terms of which the Director of Public Works was ordered and directed to "provide and construct driveways in and through said property, to construct a shelter house thereon, to provide parking facilities for automobiles, and appropriate markings therefor, and to plant shrubs and trees along the margin and borders of said area, all in accordance with" the plan attached, which plan provided a parking area for 192 to 233 automobiles, depending upon the method of parking, and providing for three north and south driveways and places of ingress and egress thereto.

Prior to the passage of this ordinance the City Counselor, and his assistants, rendered three opinions to the Mayor advising that the

tract of ground could not be used as a parking lot in view of the fact that it had been purchased out of funds from the sale of trafficway bonds and its use must be confined to trafficway purposes.

On May 26, 1941, plaintiff filed this suit. Plaintiff testified that he was a taxpayer in Kansas City and brought this suit in equity because he believed that if the defendants herein were not restrained from proceeding with the improvement called for in Ordinance #6908 (hereinafter more fully described), a parking station would be provided on the site; that he was associated with a real estate company which represented a number of owners and operators of parking stations in the vicinity of the Municipal Auditorium; that his purpose in bringing the suit was that he did not want the site in question to be used in a way that would be in competition to the commercial parking stations in that area; that so long as the property is used in a way other than as a commercial parking station he had no interest in the matter.

When plaintiff filed suit, the council, after receiving legal advice from the City Counselor's office to the effect that a court might interpret said ordinance as indicating an intention to establish a commercial parking lot, on October 20, 1941, repealed Ordinance #6576 and enacted Ordinance #6908. By the new ordinance the Council found that there was ''a necessity for the opening and establishing of trafficways in and through said property for the use, convenience and safety of the public when approaching and leaving the Municipal Auditorium .. . . and for expediting traffic to, from, and through said vicinity.'' The amended petition, upon which the cause was tried, was filed after the first ordinance had been repealed and the second ordinance passed.

The new plan shown by the plat attached to Ordinance #6908 provides for a shelter house and landscaping on the south end of the lot, with landscaping on the north and along the west side. Two north and south traffic lanes (sixty feet wide) are provided for, divided by a promenade, extending between the landscaping at the north and south ends. The east traffic lane has a south entrance eighteen feet in width, from 13th Street and an east entrance twenty-five feet in width, off of Wyandotte Street north of the Robert E. Lee Hotel. There is an exit twenty-five feet in width on Central Street a short distance south of the intersection of 12th and Central Streets. The west traffic lane, twenty-five feet wide, enters from Central Street immediately north of 13th Street, and extends north and re-enters Central Street a short distance south of 12th Street, where it has the same exit as the other traffic lane. No plan for parking is shown on this plat. It is contemplated that automobiles using the traffic lanes will fully discharge their passengers along the promenade between the traffic lanes and proceed to the Central Street exit, while the

passengers discharged will proceed south along the promenade to 13th Street and cross to the Auditorium, crossing at either end of the block.

The evidence is overwhelming that there is a great traffic congestion at the Auditorium when it is used to its full capacity, and the evidence further shows a great need for traffic relief along 13th Street at the Auditorium. The ordinance authorized the expenditure of $7,000 of the city "Trafficway Improvement Bond Funds," and the total improvement was to cost in excess of $30,000, of which the Works Projection Administration, Federal Works Agency, was to furnish labor amounting to $22,560, and material amounting to $1956. It was admitted that both the City and the W. P. A. were ready to proceed with the improvement at the time of the trial.

Defendants' answer denied that they were contemplating the establishing of a parking lot, or the diversion of the proceeds of the bond issue, and alleged that in passing said ordinance No. 6908 the members of the City Council acted in good faith and upon their best judgment to relieve traffic congestion.

Plaintiff called as a witness Mr. Edward A. Harris, a member of the Council, who testified that after receiving from the City Counselor's office the opinions mentioned above, the Council held a number of so-called informal or pre-council meetings. (The evidence shows that these were meetings held prior to the regular meetings for the purpose of going over the "docket".) The evidence is conflicting as to whether these meetings were private or public. At any rate, Mr. Harris testified that at these meetings Mr. Everham produced a number of plans for the improvement of the lot in question; that on one occasion "different members of the council interrogated him as to the number of cars that could be parked, and if they were parked there at certain angles and parallel and diagonally and so on, and he answered questions and the map was there and he pointed where the lines would be. : . . Lines indicating the number of cars that could be parked on the east and west side;" that this was immediately prior to the introduction of Ordinance #6908, and while they were discussing the form of that ordinance; that on one of these occasions Councilman Miller was the most persistent of all of them in asking the number of cars that could be parked there and "at that time Mr. Everham rose up and took his pencil and indicated along at certain angles how many cars could be parked, how many could be parked on the east side on that open spot on that plat there." Evidently, the witness was referring to the plat similar to the one attached to Ordinance #6908, which we have heretofore described. He further testified that one of the defendants said that these markings were not on the plat to be attached to the ordinance for the reason there had been too much discussion about the lot already, and too much controversy. The witness stated that he could not say which one of the defendants made this statement; that "I can't now remember with

any degree of certainty, because having these meetings, weekly meetings, discussions over a period of time I am not going to tell you any man's name. Q. What did Everham say about the way he was going to finish the surface of this lot? A. We were told it would be surfaced in such a manner and with such substance that if at any subsequent time we desired the space to be used for parking all that would be required would be to put the lines in." There was some discussion at these meetings about parking meters, whether "twenty-five cent meters would be used." The witness further testified: "Q. Did this map which he (Everham) had there which shows the number of lines that could be drawn on it, do you recall whether he had a notation on that map as to the number of cars that could be parked, or did he merely give you that information orally? A. If it was written on the map, I didn't see it; I do not remember the statement; it varied according to the position that the parked car would occupy."

He further testified that, from the time of the consideration of Ordinance #6908 up to the present time, he had discussed the ordinance with the Mayor and other persons, and discussed with the Mayor whether parking was going to be permitted on the lot; that he discussed the matter with the Mayor as late as a day or two before the trial of this case; (he did not state that the Mayor, at any time after this suit was filed, favored using the tract for parking;) that at the time the plan of painting lines on the surface showing parking spaces was discussed at the pre-council meetings no one protested except the witness, so far as he remembered. Asked whether some of the members had discussed in his presence why they were putting these two wide lanes through the lot (the sixty foot north and south trafficways that we have referred to), he answered: "Yes, we had much discussion why it was there. Whether the purpose and intent of it was fraudulent or genuine. Q. What was the tenor of that discussion? Mr. Lee: Who said it? Q. (By Mr. Slaughter): Let us take—what about Gage? A. I cannot remember the different comments of the individual councilmen, because it has covered nearly two years. We have had many, many heated discussions; some for, some against, some had fantastic and wild ideas, others had very practical ideas. I cannot by any degree of certainty tell you which councilman was opposed to certain things and which was in favor of it"; that Everham stated the reason why the two wide lanes were laid out was that if ever at any time it was desired to use them for parking that they would be available. "Q. (By Mr. Slaughter): Did defendant, Everham, show up there with a plat on which he had marked where cars could be parked, I am talking about the one Everham claims he hasn't— A. The plat was there with marks on it; and he sat on that side of the table, and I on the other. George Miller interrogated him very definitely if there was sufficient space; if they wanted it for cars to back out and if they parked parallel how many cars could be, if at

certain angle, I believe 33 1/3 degrees, and we were given that information as we called for it. Q. You discussed parking in various ways, is that right, with defendant, Everham? A. Yes. Q. Did Everham say why they had two trafficway lanes there instead of just one wide one? A. That was discussed whether they would have one or two—whether he said it or someone, it was suggested it was susceptible of accommodating more cars. Q. If you had a medial strip down on— A. Yes.''

On cross-examination, when asked whether he was not confused as to when he saw Everham with the plat that had markings concerning the parking of automobiles, whether it was before the introduction or after the introduction of Ordinance #6908, he answered: "No.'' "Q. Might you be confused about that? A. No, very certain—it made me very indignant, and I remember distinctly it was just immediately prior to the introduction of this second one, and I believe the last time he appeared before us was before the ordinance was introduced''; that he did not remember any discussions or pre-council meetings taking place after Ordinance #6908 was introduced. On recross-examination, he further testified: "Q. You don't agree with this statement here that there is no intention of making a parking station? A. I say the plan, the present plan a street 120 feet wide with a medial strip of twelve feet can be renewed the way it is cut into traffic, the way it is laid out. The fact is that by drawing lines, we can put so many cars and it leaves me to believe that the proponents of this plan have had in mind to ultimately use it for purposes other than they now claim, but I have heard no man say or declare that it would be used for parking purposes; I have not. Q. You haven't heard anything? A. I haven't heard that, but I have always been suspicious. In the forenoon that is their intention, but in the afternoon changing their opinions.''

The evidence shows that Councilman Harris originally desired that the tract in question be made into a public park, but his testimony is to the effect that after he received information that the Counselor's office had advised that the land could only be used for trafficway purposes, and perhaps even before that time, he arrived at the opinion that it could not be legally put to any other use except for trafficway purposes, and voted against Ordinance #6576.

Mr. Everham, who was called as a witness for plaintiff, testified that after the consideration of Ordinance #6908 was commenced there was no mention of parking, and Mayor Gage, who was a member of the Council and a witness for the plaintiff, stated that he could remember no such discussion. Everhm denied having at any time a map, diagram, plat or drawing before any pre-council meeting, indicating parking facilities, after the consideration of said ordinance began. He testified that he did not recall that any such parking facilities were ever discussed at all with anybody after that time;

that he never prepared a memorandum relative to the number of cars that could be parked on the tract; that "we had given up all ideas of a parking lot"; that at the present time all ideas of providing for parking had been disregarded. He admitted that he had at the pre-council meetings a plat similar to the one attached to Ordinance #6908, but said that there were no markings on it showing the places for cars to be parked.

During cross-examination of Mr. Harris, counsel for the City made a statement in open court that it was not the intention of the city to use the property in question for the purpose of a parking station, but merely for the purpose of allowing lanes to be built for the passage of automobiles; that he was making the statement on behalf of the City Administration; that the improvement of the property would be solely for the purpose of constructing those lanes and not for the purpose of permitting anyone to drive up there and park any period of time. However, Mr. Harris stated that so far as he, himself, was concerned, he had never conferred upon the attorney the authority to bind the witness in the matter, "because I have sometimes questioned the sincerity of the intention of the proponents of that plan."

The evidence shows that after the passage of Ordinance #6908, the City, through its Public Works Department, made application to the W. P. A. for financial assistance in the construction of the improvement. This consisted of a blank application where a lump sum of money was mentioned. The application was approved and oral discussions were had between representatives of the W. P. A. and persons in the City Engineer's Office, which was a part of the Public Works Department, concerning the matter, and thereafter the City Engineer made "an estimate sheet that covered the quantities that were put on the plans before the figures were given to the W. P. A." and he made "a completed plan which showed in detail and a summary of the quantities of different materials involved in the construction" from which the W. P. A. prepared plaintiff's Exhibits 6 and 6-A, which is "in a general way it is a break-down of different types and kinds of labor and the different types of material and different quantities of material that will be necessary to complete the project." Exhibits 6 and 6-A are composed of a great many items showing the various things necessary to be done in making the improvement, such as excavating, grading, filling, sewerage, etc., the estimated cost of man-hours required, labor costs and non-labor costs, the whole totalling a cost of $31,409, of which the W. P. A. was to furnish $24,663. The calculations in the exhibits were prepared upon the facts given the W. P. A. by the City Engineer's office. Exhibit 6 has indorsed on it the words "Public Land Improvement Auditorium *Parking Facilities*. Prepared by R. J. Sonnenberg, date 10-27-41, approved by (Sponsor) W. W. Highland." (Italics ours.) Sonnenberg

was an employee of the W. P. A. and Highland was an assistant to the Director of Public Works.

Plaintiff introduced in evidence a photograph of the lot in question showing a sign erected thereon reading: "A W. P. A. Project Construct *Parking Area* Department of Public Works Work Projects Administration Federal Works Agency;". (Italics ours), and another sign erected by the City reading: "This Improvement is being made possible by MONEY RAISED AND ASSIGNED TO THIS PROJECT BY KANSAS CITY TAX PAYERS Thru The Council of Kansas City."

Plaintiff makes much of the fact that Exhibit 6 refers to the improvement as "parking facilities" and the wording of the W. P. A. sign, "Construct Parking Area," and the fact that the City had its sign near the W. P. A. sign.

In relation to the exhibits 6 and 6-A, Mr. Everham testified that they were approved by his assistant, Mr. Highland, during the witness' absence and that he did not see the application until the day of the trial; that he had nothing to do, personally, with handling the matter with the W. P. A. after the passage of Ordinance #6908; that the Exhibits were prepared in his department in obedience to Ordinance #6908; that the form for Exhibits 6 and 6-A was prepared by his department in cooperation with the W. P. A. In reference to the words "Public Land Improvement Auditorium Parking Facilities" printed on the exhibits, the witness testified: "Q. So that the writing in this in typewriting, at the upper left corner of Exhibit 6, 'Public Land Improvement, Auditorium Parking Facilities' that was undoubtedly placed there by the Works Progress Official?. Mr. Slaughter: If the witness has answered I move to strike his answer. I have no objection to his telling anything he knows about it, I don't want any conclusions. Mr. Lee. My question is, wasn't the whole thing brought about and brought into the office of the Public Works Department for approval? The witness: That is the customary way. Mr. Slaughter: That is not the question. I move to strike the answer. The Court: Let the answer be stricken."

He further testified that the W. P. A. sign was placed on the lot by the Works Project Administration; that the City had nothing to do with placing it there; that the City objected to the sign saying that the project was sponsored by the W. P. A. but that that agency refused to remove the sign so the City put up its own sign saying that the project was a City project; that he did not object to the W. P. A. as to the wording on the W. P. A. sign stating "Construct Parking Area sponsored by the Department of Public Works," because "it wouldn't do any good."

The Chancellor found that there was no evidence that any of the defendants were or are guilty of any intentional fraudulent conduct, either in the passage of Ordinance #6576 enacted by the Council,

or in the subsequent enactment of Ordinance #6908; that Ordinance #6908 was valid and legal on its face; that it does not show any unlawful intention to establish a parking station for hire or otherwise, or any intention to violate its restrictions, and refused to enjoin the defendants from carrying out its terms and provisions. However, the Chancellor found that it is the desire and intention of the defendants, if the same can be done legally, to establish a parking lot on the site in question, and that defendants would have established such a lot under Ordinance #6576 if this suit had not been brought.

The court then recites the opinions of the City Counselor's office advising the Council that it could not pass such an Ordinance as Ordinance #6576, which nevertheless it did pass; that, thereafter, Ordinance #6908 was passed, which Ordinance, upon its face, is a valid and legal ordinance, and if the defendants adhere strictly to the plan of trafficway control provided in and by said ordinance and exemplified by the plan attached thereto, then, and in that event, said ordinance would be legal and lawful for the reason that said ordinance, together with the plat attached thereto, does not show, on its face, any ,unlawful or invalid intention on the part of the defendants to establish a parking station for hire or otherwise, and the ordinance would be legal and lawful so long as the defendants adhere to the avowed intention as declared by said ordinance and plat as stated by their attorneys at the trial; and that defendants should not be enjoined or restrained from carrying out the avowed purposes and intent of said ordinance; ''but the Court further finds that it has been irrespective of the law, and still is (conditioned upon it being lawfully done) the intention of these defendants, and each of them to strain the terms of said Bond Proposition Eight (which, if so done would circumvent said plat attached thereto and the statements of defendants' attorney) to the end that there be parking facilities upon said lot, which desire and intent the Court has heretofore found to be invalid and illegal.''

The court then adjudged and decreed that the defendants be perpetually restrained and enjoined from modifying,.changing or otherwise altering said ordinance in any way or manner so that by such changes or alterations said Convention Hall parking lot area might be converted into an area for parking facilities, either with or without hire, and the defendants be further restrained and enjoined from permitting the parking of automobiles upon the site except that horizontal or parallel parking could be permitted along the right hand curbs of the trafficways provided by the ordinance.

It is insisted by the defendants that, under the evidence, the court erred in entering the decree for the reason (among others) that, at the most, there is only a mere apprehension on the part of the plaintiff that Ordinance #6908 will be violated; that the evidence shows no real or imminent danger of such violation taking place.

"The purpose of an injunction is to restrain acts, actual or threatened. It is frequently termed 'the strong arm of equity,' or a 'transcendent or extraordinary remedy'; the injury must be real, not imaginary. It is one which is to be used sparingly and in clear cases only, and the decree should be so framed as to afford the relief to which the complainant is entitled, and not to interfere with legitimate and proper action on the part of those against whom it is directed. . . . The court cannot grant an injunction to allay the fears and apprehensions of individuals. They must show the court that the acts against which they ask protection are not only threatened, but will in all probability be committed, to their injury. [Lester Real Estate Co. v. City of St. Louis, 169 Mo. 227, 69 S. W. 300; Danforth v. Foster, 158 Mo. App. 94, 139 S. W. 520.]'' [Commission Row Club v. Lambert, 161 S. W. (2d) 732, 736.]

In Lester Real Estate Co. v. City of St. Louis, 169 Mo. 227, 234, it is stated: "Hence, neither in fact nor in theory has the plaintiff's property been damaged by anything that has been done or can be done under any ordinance now in existence, and without the authority of an ordinance nothing can be done. No real or imminent danger or damage is shown, and there is not even a reasonable apprehension, prospect, possibility or contingency of any such shown to exist.

"In 16 Am. & Eng. Enc. Law (2 Ed.), p. 361, the rule is thus stated: 'The court cannot grant an injunction to allay the fears and apprehension of individuals. They must show the court that the acts against which they ask protection are not only threatened, but will in all probability be committed, to their injury. An injunction should not be issued to prevent the doing of an act unless the petitioner shows reasonable grounds for apprehending that it will otherwise be done. If, however, it is shown that the defendants threaten to do the wrong, and that they have the power, the court will issue the writ.' '' [See, also, 2 Beach, Inj., sec. 1301; 1 High, Inj. (3 Ed.), sec. 886.]

We are of the opinion that plaintiff is unduly apprehensive that a parking station will be established by the City on the tract of land in question. We believe that there is no reasonable probability that such will be done. Giving full credit to the testimony of Councilman Harris, it fails to show any more than an apprehension on his part that the lot in question will be turned into a parking station. His testimony is very indefinite as to which of the councilmen favored using the lot for parking purposes when the proposed enactment of Ordinance #6908 was under consideration.

When the proposed ordinance was being considered at the pre-council meetings, the only particular councilman whom he could mention as having such a desire in mind was Mr. Miller, perhaps. Mr. Harris' testimony would indicate this though he did not so state directly. Mr. Miller questioned Mr. Everham, at various times, as to what could be done in reference to parking cars on the tract in

question. While Mr. Harris stated that Mr. Everham had various plats and maps before the various pre-council meetings showing lines for the parking of cars, there is no evidence as to how Mr. Everham happened to make these lines. He may have prepared the plats or maps, so showing, at the request of Mr. Miller or some other councilman. Mr. Harris did not say that Mr. Everham was advocating the creation of parking facilities but it would appear that the latter was merely attempting to answer the inquiries made by Mr. Miller, and perhaps others, without indicating that the plats or maps, after the lines had been made thereon, expressed the views of Mr. Everham about the matter. However, in any event, there is no evidence that Mr. Everham, without authority from the council, will attempt to make the tract into a parking lot. Mr. Harris' testimony is really boiled down in his last answer where he stated that he had never heard any man say or declare that the lot would be used for parking purposes. But Mr. Harris, himself, was fearful that some parking would be permitted because there is a thoroughfare 120 feet wide contemplated, with a medial strip twelve feet in width, leaving two lanes each sixty feet wide, and there was some discussion at the pre-council meetings about the availability of these lanes for parking purposes. It might also be recalled that Mr. Harris said that he recollected no talk of parking *after* Ordinance #6906 was introduced.

We, therefore, feel confident in stating that there is no evidence of any particular councilman expressing any intention of having the proposed ordinance (6908), afterwards passed, violated unless the action of Mr. Miller would raise the inference that it was his intention to have this done. There is no showing, at least by direct evidence, that Miller intended that it should be done, if he thought it could not lawfully be done, and the Chancellor did not indulge in an inference that he so intended because the Chancellor was apparently of the opinion that there was no unlawful purpose in the mind of any councilman.

The Chancellor found that there was no intention on the part of the defendants to violate the ordinance, and the plaintiff has not appealed and is making no contention that, under the evidence, the court should not have made such a finding. The decree of the court indicates that the Chancellor was convinced that the defendants did not propose to do anything looking toward providing for parking facilities on the tract in question, except that which could be lawfully done, but, in view of the fact that the evidence shows that the defendants were very desirous at the beginning that parking facilities be provided, as shown by the fact that they passed Ordinance #6576, regardless of the opinion rendered by the City Counselor's office to the effect that it would be an invalid ordinance, together with the other evidence appearing of record, he was fearful that defendants would strain their powers in the premises, that is to say, that they

were so desirous of providing parking facilities on the tract, although they wished to do nothing that was unlawful, in attempting to do everything that could be done lawfully toward effecting a place for parking, they would strain their authority and commit an unlawful act. Consequently, the court restrained them, not as plaintiff in his petition would have him to do, but against committing certain acts, of which restraints defendants particularly complain. (We have heretofore set forth the terms of the injunction granted by the court.) The court, having found the good intentions of the defendants should not have restrained them, under the evidence in this case, merely because he had some apprehension that they would possibly disobey or amend Ordinance #6908.

As to the application to the W. P. A. and the signs appearing on the lot, and the indorsements on Exhibit 6, as follows: ''Public Land Improvement Auditorium Parking Facilities,'' this was undoubtedly placed thereon by Mr. Sonnenberg, agent for the W. P. A. Where he got the information that the lot was to be used for parking facilities is not disclosed in the record. Assuming that some one in the City Engineer's office made some statement to the representative of the W. P. A. to the effect that the tract was to be used for parking facilities, there is no evidence of any authority of such a person to make a representation and, at any rate, we do not think that this circumstance, together with all of the others upon which plaintiff relies, is sufficient to base the injunction granted by the Chancellor. There can be no parking facilities provided without an ordinance passed by the City Council, which is composed of nine members including the Mayor, and there is no evidence in the record which convinces us that it is their intention to repeal said ordinance, or to enact another one permitting parking upon the tract. The W. P. A. sign was placed upon the lot by that agency. The City was not responsible for its action in so doing. No doubt the information contained in the sign ''Contruct Parking Area'' was placed thereon as a result of the information contained in plaintiff's Exhibit 6 in reference to parking facilities. The City placed its own sign upon the lot, and there is nothing upon its sign to indicate that the lot was to be improved for parking purposes. After a thorough examination of the record in this case, we are convinced that the injunction was improvidently granted.

The judgment is, therefore reversed. *Cave, J.*, concurs.