JOHN B. BOWMAN ET AL., Appellants, v. CITY OF KANSAS CITY, MISSOURI, ET AL., Respondents, No. 41719—233 S.. W. (2d) 26.

Court en Banc, October 9, 1950.

*B. T. Hurwitz* and *Eugene Taxman* for appellants.

*David M. Proctor,* City Counselor, and *Benj. M. Powers,* Associate City Counselor, for respondents.

[27]   DALTON, J.—Action in equity by plaintiffs, as resident taxpayers of Kansas City, Missouri, on behalf of themselves and all others similarly situated, to enjoin Kansas City, the members of the city council, the mayor and other officers, from carrying out or attempting to carry out the terms of an alleged illegal and void ordinance, from appropriating or expending public funds thereunder to purchase described real estate, from expending (for the purpose of establishing parking stations and garages for hire) any bond funds authorized and obtained by said city for trafficways and boulevard improvements, from converting specific real estate to parking station purposes and for other relief.   The trial court denied the relief sought and dismissed the petition.   Plaintiffs have appealed.

On May 26, 1931, at a special bond election in Kansas City, a bond issue was authorized under Proposition No. 8 "to pay the City's share of the cost of the acquisition of the necessary lands for the opening, widening and establishing of trafficways and boulevards in the City and the improvement of the same for travel including the necessary bridges and viaducts thereon."   An increase in the indebtedness of the city for said purposes in the sum of $8,300,000.00 was approved.   Thereafter, the city adopted an ordinance declaring the result of the special city bond election, authorizing the issuance of bonds, fixing the form thereof, providing for an annual tax to be levied for interest and providing for the payment [28] of principal when due.   From the proceeds of this bond issue, the city on June 27, 1935, acquired a tract of land, referred to as the "Old Convention Hall Site," being approximately the west ⅔ of the block immediately north of the Municipal Auditorium in Kansas City and separated from the site of Municipal Auditorium by 13th street. The city also acquired other described real estate in that vicinity.   It

will not be necessary to review subsequent proceedings prior to May 2, 1949, but those interested may refer to Ewing v. Kansas City, 350 Mo. 1071, 169 S. W. (2d) 897; and Ewing v. Kansas City, 238 Mo. App. 266, 180 S. W. (2d) 234.

On or about May 2, 1949, the City Council of Kansas City, adopted an ordinance, being Ordinance No. 12627, which was entitled "An ordinance to condemn and take private property for public use as the site of an off-street public parking facility." It, in part, provided that, "Whereas, the volume of automobile traffic within the central or downtown retail district of the city, particularly in the area of the Municipal Auditorium, has increased to such an extent as to result in serious congestion of traffic, and the privately operated facilities for parking of automobiles within or adjacent to said Municipal Auditorium, are inadequate to provide for parking of automobiles during the hours when their passengers are in said retail district or attending functions, exhibitions and public gatherings in said Municipal Auditorium; and whereas, it is, therefore, necessary for the protection and convenience of the public that the city acquire, develop and operate or cause to be operated additional public parking facilities available to said area; and whereas, Kansas City is the owner of * * * (particularly described real estate) * * * directly across the street north from said Municipal Auditorium, and also * * * (other particularly described real estate) * * * and now proposes to develop said area or as much thereof as may be required to relieve traffic congestion, for an off-street public parking facility and to operate such parking facility for the parking of automobiles and make a charge therefor, or, if deemed expedient, to lease such parking facility for private operation for the parking of automobiles for a charge, and it is deemed necessary to acquire additional lands therefor, to wit: Lot 14, Block 3, Reid's Addition * * * ."

The ordinance then authorized the condemnation of the last mentioned tract "for public use as the site, or a portion thereof, of an off-street public parking facility which may be developed and used for the parking of automobiles for a charge or may be leased, in whole or part, to others for private operation as a public parking facility for the parking of automobiles for a charge."

It is admitted that the plaintiffs have been for many years and are now engaged in the business of parking automobiles for hire in what is commonly known as the parking station and garage business in the immediate vicinity of the Municipal Auditorium in Kansas City; that they have large investments, as specified, in said businesses; and that they have spent additional sums of money and time in developing good will, custom and trade at their respective locations. Other facts will be stated in the course of the opinion.

Plaintiffs charged that any funds derived from the sale of bonds under Proposition No. 8 were in effect trust funds and could not be legally expended for purposes other and different from those submitted to the voters under the terms of Proposition No. 8; that in and by Ordinance No. 12627 the city council had announced its intention to, and unless restrained would, unlawfully and illegally expend the said bond funds for the purpose of establishing and creating a parking station or garage for hire; that "the said Ordinance No. 12627 permits taxation for a private purpose instead of a public purpose, and, with the proceeds of such taxes, permits the defendant City to engage in a business non-public in its nature, in competition with the well-established business of the plaintiffs  *   *   *"; that the parking station business is not a public utility function; that the ordinance, supra, authorizing said business, was an unlawful attempted exercise of police power; that the enforcement of said ordinance would deprive plaintiffs of their property without due process of law; that [29] there was no valid provision of the charter authorizing the city to condemn land for parking station purposes; that, unless defendants were restrained, "plaintiffs and others similarly situated *   *   *  will be unlawfully taxed for the purpose of providing funds for the interest payments and sinking fund requirements of and for the bonds authorized under Proposition No. 8 as aforesaid, which bonds, and the proceeds therefrom, will be illegally and unlawfully used  *   *   * and further, plaintiffs and others similarly situated will be unlawfully taxed if the defendants and any of them are permitted to condemn property for a wholly private and non-public use, and further, these plaintiffs and others similarly situated will be compelled to pay taxes  *   *   *  for the purpose of permitting the said defendant City to engage in private business in direct, immediate and open competition with plaintiffs and others similarly situated." Injunctive relief was prayed, as above stated, and there was a prayer for general relief. The constitutional provisions cited and relied upon include Sec. 3, Art. X; Sec. 27, Art VI; Sec. 10, Art. I, Constitution of Missouri 1945; Sec. 1 of the 14th Amendment of the Constitution of the United States.

The parties signed a stipulation of facts (containing 23 paragraphs and certain exhibits) subject to the privilege of either party objecting thereto on the ground of immateriality, irrelevancy or incompetency. Only the facts stated in paragraphs 14, 15, 16, 22 of the stipulation were admitted in evidence.

Appellants first contend that "the trial court erred in rejecting evidence bearing on the question of whether the contemplated use of land sought to be taken by eminent domain is a 'public use.'" The evidence referred to is pointed out in argument as paragraphs 1 to 6 inclusive, and 8 to 11 inclusive, of the stipulation of facts. Appellants say: "The matter contained in these paragraphs demon-

strated factually and in detail the amount of parking space available in the downtown area of Kansas City, Missouri, and, more particularly, the amount of parking space available in the vicinity of the Municipal Auditorium. The matter contained in these paragraphs also deals with the question of whether there is a need for parking space in the downtown area, and, more particularly, in the vicinity of the Auditorium. * * * The only evidence tendered by either side concerning the availability of parking spaces and the need, if any, for additional spaces was excluded.''

In an equity case, which we try de novo, this court is not required to reverse a judgment because of the chancellor's incorrect rulings on evidence, but this court on appeal usually ''considers such evidence in the record as it deems admissible, excludes from consideration evidence improperly admitted, and reaches its judgment on the competent evidence offered without regard to the trial court's rulings.'' Snow v. Funck (Mo. Sup.), 41 S. W. (2d) 2, 5; Lanphere v. Affeld (Mo. Sup.), 99 S. W. (2d) 36, 39. The facts stated in the mentioned paragraphs had little tendency to show non-public purposes. As is indicated by appellants' statement, the matters contained in the paragraphs were primarily for the consideration of the agency proposing to condemn the described property, but such facts as are considered material will be considered in determining the issues presented.

The necessity and expediency of the proposed taking were legislative and political, not judicial questions and the evidence offered and excluded in so far as it related to such questions, was properly excluded. ''In such a case, it is well settled that the utility of the proposed improvement, the extent of the public necessity for its construction, the expediency of constructing it, the suitableness of the location selected, and the consequent necessity of taking the land selected for its site are all questions exclusively for the legislature to determine, and the courts have no power to interfere or to substitute their own views for those of the representatives of the people.'' 18 Am. Jur. 731, Eminent Domain, Sec. 105; 29 C. J. S. p. 878, Sec. 87. The same rule applies to a municipal ordinance authorized by statute. Kansas City v. Liebi, 298 Mo. 569, 252 S. W. 404, 407; City of Kirkwood v. Venable, 351 Mo. 460, 173 S. W. (2d) 8, 11; State ex rel. State [30] Highway Commission v. Curtis, 359 Mo. 402, 222 S. W. (2d) 64, 68; Board of Regents for Northeast State Teachers College v. Palmer, 356 Mo. 946, 204 S. W. (2d) 291, 294; Bader Realty & Inv. Co. v. St. Louis Housing Authority, 358 Mo. 747, 217 S. W. (2d) 489, 493.

Where the exercise of the power of eminent domain is proposed, a properly interested party such as a taxpayer, has a right to demand that the court hear evidence to determine whether the taking is for a public or a private use. City of Kirkwood v. Venable, supra (173 S. W. (2d) 8, 11); City of St. Louis v. Brown, 155 Mo. 545, 555,

56 S. W. 298; Kansas City v. Hyde, 196 Mo. 498, 513, 96 S. W. 201; 29 C. J. S. 820, Sec. 29(c). Ordinarily, however, a determination of the question does not involve the hearing of evidence, although it may do so. The St. Joseph Terminal R. Co. v. Hannibal & St. J. R. Co., 94 Mo. 535, 543, 6 S. W. 691; State ex rel. City of Cape Girardeau v. Engelman, 106 Mo. 628, 632, 17 S. W. 759; City of Cape Girardeau v. Houck, 129 Mo. 607, 618, 31 S. W. 933; Southern Illinois & M. Bridge Co. v. Stone, 174 Mo. 1, 22, 73 S. W. 453. The reason apparently is that the facts determinative of the issue are ordinarily matters of common knowledge of which the courts must take judicial notice, whether requested to do so or not. "Courts are bound to take judicial notice of facts which are matters of common knowledge." Spoeneman v. Uhri, 332 Mo. 821, 60 S. W. (2d) 9, 12. "Courts are not presumed to be ignorant of matters about which the general public knows." City of St. Louis v. Pope, 344 Mo. 479, 126 S. W. (2d) 1201. The question of public use or purpose is a judicial question and is not one of fact for a jury. City of Savannah v. Hancock, 91 Mo. 54, 57, 3 S. W. 215; Art. I, Sec. 28, Const. of Missouri, 1945.

Appellants next contend that "the trial court erred in holding that the Trafficways Improvement Bond Fund could be diverted to garage or parking station purposes." We find no such holding in the record. The trial court did not so hold. The facts stipulated on this point are that "Kansas City, Missouri, acquired the Old Convention Hall site by deed dated June 27, 1935, from the Kansas City Convention Hall Building Company, for a stated consideration of $750,000.00. The conveyance was by a warranty deed conveying the property in fee to the city without reservation or special dedication for any purpose. The said $750,000.00 was derived by the City Manager from Trafficway Improvement Bond Funds, being voted by the people under Proposition Number 8, on May 26, 1931. Thereafter, and as a part of said transaction, the Kansas City Convention Hall Building Company, a non-profit corporation dissolved and paid back to Kansas City, Missouri, the sum of $725,000.00, which was deposited to the credit of Kansas City Auditorium Bond Funds, voted by the people on May 26, 1931, as Proposition Number 11, and said $725,000.00 was expended by Kansas City, Missouri, in completing the Municipal Auditorium * * *." Plaintiff further offered evidence tending to show that other real estate was purchased with the same funds. The evidence was excluded. Appellants now say that, in addition to the Old Convention Hall Site, the city acquired parts of fourteen other lots in the same block, paying therefor an aggregate consideration of $205,000.00 out of the Trafficways Improvement Bond Fund; and that the proposed use of this property "constitutes a diversion of the Trafficways Improvement Bond Fund."

The court held that $750,000.00, representing the proceeds of a bond issue voted by the people on May 26, 1931 under proposition 8

for trafficways and boulevards, had been illegally diverted and was used for the completion of the Municipal Auditorium; that the diversion was complete; that "the law does not hold that property purchased with funds voted for a special purpose has to be used for the special purpose for which the funds were voted under all circumstances"; that the deeds conveying the Convention Hall Building Company property to the city placed no restrictions on the use to which the property could be put; and that the city held the title to the Convention Hall site free of any restrictions as to use.

[31] The record fails to show that there were any Trafficways Improvement Bond Funds in existence when this suit was instituted. The part of the fund mentioned had long since been spent and disposed of. Defendants were not threatening and about to divert or "illegally expend" any bond funds authorized under Proposition 8. The cases cited, such as Thompson v. St. Louis (Mo. Sup.), 253 S. W. 969, 972; Meyers v. Kansas City, 323 Mo. 200, 18 S. W. (2d) 900; City of St. Louis v. Senter Commission Co., 337 Mo. 238, 85 S. W. (2d) 21, 25 (holding that trusts funds voted for a particular purpose may not be diverted), have no application under the facts of this case. Appellants further cite Sec. 29, Art. VI of the Constitution of 1945 and Sec. 20, Art. X of the Constitution of 1875, dealing with "moneys arising from any loan, debt, or liability contracted by the state, or any county, city, or other political subdivision." No such "moneys" were shown to be in existence when the suit was instituted and none was diverted by the court's judgment. The cited sections have no application. While appellants close their argument under this heading with a statement of their belief that "property purchased with the proceeds of trafficways bonds cannot be diverted by specious reasoning and devious logic to parking station and garage purposes," no authorities are cited in support of the statement. We think the record clearly shows, as hereinafter more fully stated, that the proposed use of this property is directly connected with trafficway improvement and that no facts are shown which prevent such use of the property.

Appellants further contend (1) that "the trial court erred in failing to enjoin the defendant city's proposed entry into the garage and parking station business as taxation for a private purpose contrary to Section 3, Article X of the Constitution of Missouri"; (2) that the "proposed entry into the garage and parking station business was in violation of the Federal Constitution, Section 4 of Article IV and Section 1 of the 14th Amendment and Section 10 of Article I of the Missouri Constitution"; and (3) that "the garage and parking station business is not a public utility such as contemplated by Section 27 of Article VI of the Missouri Constitution." Appellants insist that the later constitutional provision contemplates business of a type "which has traditionally been regarded as a public utility

\* \* \* a monopoly''; and that the operation of parking stations is excluded. Appellants say that Laws of Missouri, 1947, p. 392, Sec. 1, Mo. R. S. A. Sec. 7411(a) authorizing Kansas City and certain other cities to acquire property for such purpose and to engage in such business is unconstitutional and invalid as in conflict with fundamental law of the state; and that the same is true for the Kansas City Charter Amendment, Sec. 128.3 and Ordinance No. 12627, supra, both of which authorize the acquisition, operation and use of property for off-street parking facilities. Other than the constitutional provisions cited, appellant relies particularly upon State ex rel. Kansas City v. Orear, 277 Mo. 303, 210 S. W. 392; Kennedy v. Nevada, 222 Mo. App. 459, 281 S. W. 56; Cleveland v. Ruple, 130 Ohio St. 465, 200 N. E. 507.

In State ex rel. Kansas City v. Orear, supra, this court held that a city could not legally engage in selling ice to the general public. In Kennedy v. Nevada, supra, the Kansas City Court of Appeals held that a city was without legal authority to operate a tourist park as a business. In Cleveland v. Ruple, supra, the Ohio court held that the operation of a garage for use for the public generally was not a proper public purpose which a city was authorized to undertake; and that public moneys could not be spent for such purpose nor taxes levied and raised therefor. The city was enjoined ''from operating the garage as a purely private business in competition with privately owned garages,'' but was permitted to use the building to provide parking space for automobiles of patrons of public gatherings in public buildings located in an adjacent civic center and to make a charge therefor. Subsequent legislation enacted in Ohio has empowered municipal corporations to establish and operate off-street parking [32] facilities for motor vehicles. Ohio G. C. Secs. 3939-2, 3939-3, effective August 12, 1949.

Whether or not appellants' position in the above assignments is well taken essentially depends upon whether the purposes for which the city proposes to condemn the described real estate and the purposes sought to be carried into effect by the statute, charter amendment and ordinance were public purposes as distinguished from private purposes. ''Taxes may be levied and collected for public purposes only \* \* \*.'' Sec. 3, Art. X, Const. of Mo. 1945. ''When an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public.'' Sec. 28, Art. I, Const. of Mo. 1945. Taxation for other than public purposes is taking property without due process of law, within the meaning of the Fourteenth Amendment to the Federal Constitution. Green v. Frazier, 253 U. S. 233, 64 L. Ed. 878, 881.

The pleadings in this case present no issue of fraud. There is no contention that the alleged public purposes sought to be carried into

effect by the ordinance in question are not the purposes intended, or that the property proposed to be taken can never be used or will not be used for the proposed purposes, nor is it contended that the proposed taking is in truth and in fact to serve some specific private purpose. The contention is that the proposed purposes are not public purposes, nor purposes in which defendant City may engage under the Federal and State Constitutions. Under the pleadings and issues in this case the burden of proof to establish such contention rested on plaintiffs-appellants. While the term "garage business" is frequently used in the record there is no evidence tending to show that defendants intend to violate the terms of Sec. 7411(a), supra, which expressly provide: "Such municipality shall not dispense or furnish or allow any lessee or occupant to dispense or furnish, upon or in connection with any property or facility acquired or operated pursuant to this section any product or service other than the parking of motor vehicles." The trial court held that "the matters proposed under the ordinance in question are of a public nature and for a public purpose"; and that the legislative departments of the state and city had not overstepped their legislative bounds in any of the respects claimed by the plaintiffs.

The term "public purposes," as here referred to, denotes those objects and purposes for which taxes may be levied and for which real estate may be taken under the power of eminent domain. It is a term of classification in contrast to those objects and purposes which, under the constitution and laws of the state, must be left in private hands. A determination of whether specific purposes, such as those indicated in the statute, charter amendment and ordinance in question are public or private, is often a close and difficult question. Whether the acquisition, use and operation of parking stations for hire are for "public purposes" within the purview of the fundamental law of this state has not previously been determined.

No hard and fast rule can be laid down for the purpose of determining whether specific uses and purposes, such as those now under consideration, are public or private. In 18 Am. Jur. Eminent Domain, Sec. 36, p. 660, it is said: " 'Public use,' as applied to the exercise of the power of eminent domain, is not capable of a precise definition. The term is elastic and keeps pace with changing conditions." In the case of Kansas City v. Liebi, supra, 252 S. W. 404, 407, this court said: "A little investigation will show that any definition attempted would exclude some subjects that properly should be included in, and include some subjects that must be excluded from, the operation of the words 'public use.' Naturally a definition or description of the limits of 'public use' is likely to vary with the character of case in which the term is employed. * * * As might be expected, the more limited application of the principle appears in the earlier cases, and the more liberal application has been rendered

necessary [33] by complex conditions due to recent developments of civilization and the increasing density of population. In the very nature of the case, modern conditions and the increasing interdependence of the different human factors in the progressive complexity of a community make it necessary for the government to touch upon and limit individual activities at more points than formerly. In order to constitute public use, it is not necessary that the whole community or any large part of it should actually use or be benefited by a contemplated improvement. Benefit to any considerable number is sufficient. \* \* \* Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character.''

Some authorities hold that courts '' 'must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to the public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation.' '' Jennings v. City of St. Louis, 332 Mo. 173, 58 S. W. (2d) 979, 980. Later, in Laret Inv. Co. v. Dickmann, 345 Mo. 449, 134 S. W. (2d) 65, 68, this court said: ''To be guided solely by whether a given activity had, at some previous time, been recognized as a public purpose would make the law static. Such a standard would compel us to retain in the law, as appropriate for public expenditure, activities which have ceased to be of public concern; and would prevent us from adopting new public functions regardless of how essential to the public welfare they may have become by reason of changed conditions. Nor can we be governed alone by the fact that only a portion of the public will be directly benefited, or benefited in a greater degree than the public generally.'' And see, Halbruegger v. City of St. Louis, 302 Mo. 573, 262 S. W. 379, 381; 29 C. J. S. 823, Eminent Domain, Sec. 31.

We begin, therefore, with a consideration of the state statute, Sec. 7411a, supra, authorizing the city to take the action which it proposes under its charter amendment (Sec. 128.3) and the city ordinance in question. In the Halbruegger case, supra, which was an action to enjoin the issuance of bonds (voted pursuant to state and municipal enactments) to procure funds for a Municipal Auditorium and Community Center Building in St. Louis, it was contended that the purpose designated was not a public purpose. In that case this court pointed out that the Legislature had authorized certain cities to erect or acquire ''a public auditorium or convention hall.'' The court said: ''In the process of passing these acts the state Legislature necessarily determined that the erection or acquisition of such struc-

tures was 'a public purpose. The fact that the section applies to only part of the cities of the state does not affect the finding mentioned. Not the character of the finding but only the extent of the declared legislative policy, is limited. There is no act which forbids St. Louis to erect a like structure. That matter is left to the Charter and the Constitution. There is no dissent from the doctrine that, to justify judicial interference to defeat an adopted purpose on the single ground that it is not a public purpose, the violation of the principle must be clear, and the reason for interference strong." (262 S. W. (2d) 381). And see, State ex rel. City of Excelsior Springs v. Smith, 336 Mo. 1104, 82 S. W. (2d) 37, 40.

Further, "An act of the Legislature carries the presumption of constitutionality. The court will not declare an act unconstitutional unless it plainly contravenes the Constitution." State ex rel. Fire Dist. of Lemay v. Smith, 353 Mo. 807, 184 S. W. (2d) 593, 594. "While it is the duty of the courts to guard the constitutional rights of the citizen against merely arbitrary power, it is equally true that legislative enactments should be recognized and enforced by the court, as embodying the will of the people unless they are plainly and palpably a violation of the fundamental law of the Constitution." Blind v. Brockman, [34] 321 Mo. 58, 12 S. W. (2d) 742, 747(5) ; Barker v. St. Louis County, 340 Mo. 986, 104 S. W. (2d) 371, 377.

Were the purposes in question public purposes? The purposes for which the real estate was proposed to be taken and the purposes for which the defendant city proposes to collect taxes and expend public funds clearly appear from ordinance number 12627. We have seen that the ordinance was authorized by both the state statute and the charter amendment. The direct or implied findings resulting from these legislative declarations, while not controlling are persuasive and entitled to great weight. As stated, we must presume that the declared purposes are public purposes "unless it clearly appears that they are not in harmony with the provisions of the constitution." Laret Inv. Co. v. Dickmann, supra, 134 S. W. (2d) 65, 68. Little evidence was offered bearing directly upon the question here for consideration.

The stipulation of facts shows that some twenty-three states have passed enabling legislation authorizing municipalities to acquire and operate off-street parking facilities for a fee; that, since 1940, there has been substantial agitation by the downtown committee of the Chamber of Commerce to have Kansas City go into the parking business; that on November 4, 1947, the electors of Kansas City voted 29,877 to 11,743 on Proposition No. 11 to authorize the issuance of $1,250,000.00 general obligation bonds of the city "for the construction and equipment of public parking facilities and the acquisition of lands therefor"; that during the fiscal year beginning May 1, 1948, and ending April 30, 1949, Kansas City issued a total of 120,782 automobile licenses; and that in the fiscal year beginning May 1, 1948,

and ending April 30, 1949, there was a total attendance of 1,916,882 persons at functions held in the Municipal Auditorium." Other evidence tended to show that off-street parking was a matter of considerable public importance. On May 13, 1949, there were 16,300 off-street parking spaces and 2692 curb parking spaces provided and available within the area bounded by 6th street, Broadway, 15th street and Locust. There were 9122 available actual off-street parking spaces in the area bounded by 8th, Oak, 15th and Wyandotte. City licenses were paid on a total of 8130 of these off-street parking spaces (4124 of these spaces were in the area bounded by 10th, Broadway, 14th and Walnut). Approximately 40 persons were engaged in the parking station and garage business in the area bounded by 8th, Broadway, 15th and Locust. The "garage and parking station industry in said downtown area in said Kansas City represents an investment in real estate of a present assessed valuation of $6,983,290.00, of which $4,581,050.00 is land, and $2,402,240.00 is for improvements thereon. The real estate is valued by its owners at approximately $12,000,000.00. Approximately 1500 persons are employed in the industry, with an annual payroll somewhat in excess of $1,000,000.00." We take judicial notice of the fact that Kansas City had a population of 399,178 in 1940 and that the metropolitan area of which Kansas City is the center has a population of approximately 600,000.

It is common knowledge that, during the last 20 years, there has been a very great increase in the number of motor vehicles; and that they are now extensively used for the transportation of persons and property. With the increased use of such vehicles, the necessity for parking space has greatly increased. The use of the streets for parking purposes has materially interfered with their use for the movement of traffic and the discharge of passengers and property from such vehicles. Traffic congestion has become an acute problem in many of the cities and towns in this state. The problem of parking or the temporary disposition of these vehicles during business hours when such vehicles are not in active operation is directly connected with the problem of transportation. The parking of such vehicles cannot be separated from their use in transportation and their operation upon streets and highways. Traffic problems arising from the use and operation and temporary disposition of the [35] increasing numbers of motor vehicles in operation on the highways of the state has repeatedly had the attention of the state legislature and the legislative bodies of many of our cities and towns. The parking of such vehicles on and off the streets has had attention. See, Sec. 7411(a), supra; Sec. 8385, R. S. 1939; Laws 1943, p. 451, Sec. 1; Laws 1947, Vol. I, p. 451, Sec. 1. The growth of the problem of parking and its acuteness is further evidenced by the general use of parking meters in the business districts of our cities and towns. It is common knowl-

28

edge that traffic is congested and adversely affected by the extensive parking of vehicles upon the streets. Efforts to facilitate the movement of traffic has resulted in the establishment of one way streets and the prohibition of parking on one or both sides of certain streets. We take judicial notice of the fact that off-street parking tends to facilitate traffic and avoid hazards to life and property. In few cities and towns are the streets in the business districts of sufficient width to accommodate the greatly increased traffic resulting from the almost universal use of private motor vehicles. The parking of these vehicles is directly connected with their convenient use and operation and both matters have been dealt with by the same statutes. See Sec. 8385 R. S. 1939. The matter of the control of such motor vehicles when entering or leaving public highways, their movement on the highways, the parking of such vehicles on the highway or on public areas provided off the highway and the regulation and control of motor vehicle traffic generally is referable to the police power, as being directly connected with public safety and welfare. This police power may be delegated by the state. State ex rel. Audrain County v. City of Mexico, 355 Mo. 612, 197 S. W. (2d) 301, 302. Further, the acquisition and operation by municipalities of off-street parking areas for motor vehicles is, we believe, closely related to and governed by the same principles of law as govern the acquisition and control of municipal airports, which are for a public purpose. Dysart v. City of St. Louis (Mo. Sup.), 11 S. W. (2d) 1045; Ennis v. Kansas City (Mo. Sup.), 11 S. W. (2d) 1054.

▮ Whether the acquisition (under statutory authority) of real estate for off-street parking areas is for a public use and whether the establishment and operation by a municipal corporation of such an off-street parking facility is for a public purpose is not to be determined by the necessity or expediency of having such an off-street parking area in a particular place in Kansas City. We hold that the purposes proposed to be carried into effect by the ordinance in question are public purposes. Similar views have been expressed by the courts of other states. City of Richmond v. Dervishian, 190 Va. 398, 57 S. E. (2d) 120, 124; Miller v. City of Georgetown, 301 Ky. 241, 191 S. W. (2d) 403, 405; Whittier v. Dixon, 24 Cal. (2d) 664, 151 P. (2d) 5, 7; McSorley v. Fitzgerald, 359 Pa. 264, 59 A. (2d) 142, 145; In Re Widening of Fulton Street, 248 Mich. 13, 226 N. W. 690, 691; Wayne Village President v. Wayne Village Clerk, 323 Mich. 592, 36 N. W. (2d) 157; Annotation 8 A. L. R. (2d) 373.

▮ The acquisition of land for and the establishment and operation of public off-street parking stations or garages by the defendant city being for a public use and for public purposes, the fact that such stations will compete with private enterprises is not material or decisive. It is well settled that, if it is in the public interest and for a

public purpose, a city may be authorized by the state to engage in a business commonly carried on by a private enterprise; and in such case such city may levy a tax to support such business and compete with private interests engaged in a like activity. Puget Sound Power & Lt. Co. v. City of Seattle, 291 U. S. 619, 54 S. Ct. 542, 545, rehearing denied 292 U. S. 603, 54 S. Ct. 712.

The judgment is affirmed.

All concur.