**CITY OF KANSAS CITY, Missouri, a Municipal Corporation, Appellant,**

**v.**

**Sheridan E. KINDLE et al., Respondents.**

**No. 53731.**

Supreme Court of Missouri,
Division No. 1.

Nov. 10, 1969.

[redacted]

[redacted]

Herbert C. Hoffman, City Counselor, Richard W. Mason, Jr. and L. B. Saunders, Associate City Counselors, Kansas City, for appellant City.

James W. Benjamin, Cecil L. Caulkins, Rogers, Field & Gentry, Kansas City, for respondents.

J. Robertson Claggett, Kemp, Koontz, Clagett & Norquist, Kansas City, of counsel.

Achtenberg, Sandler & Balkin, Lloyd S. Hellman, Kansas City, for respondents.

HOUSER, Commissioner.

This is the second appeal in a condemnation proceeding. On the first appeal, In re Coleman Highlands, Mo.Sup., 401 S.W.2d 385, a judgment dismissing the proceedings in the pleading stage, on motion of certain property owners, was reversed and the cause was remanded to afford the parties an opportunity to present evidence on the question whether the taking was for a public or a private use or purpose. Reference is made to the previous opinion for background information, a resume of the ordinance in question and a statement of the

nature of the issue then and now before the court.

On remand extensive evidence was heard before a jury of six freeholders which returned a verdict awarding a total of $37,558.88 to a number of property owners and assessing benefits against the various lots in the benefit district. The court, however, set aside the verdict and ruled the ordinance unconstitutional as a taking of property for private purposes in violation of Article I, Section 28 of the Constitution of Missouri, 1945, V.A.M.S. The court also made an award of $952.50 to an attorney for services rendered in the case as amicus curiae. Condemnor, the City of Kansas City, has appealed. A construction of the constitution is involved and more than $15,000 is in dispute.

The evidence developed on remand shows the following: Coleman Highlands, a subdivision of Kansas City, consists of 328 tracts held under 278 individual ownerships. The eastern boundary is Summit Street, now called Southwest Trafficway. Karnes Boulevard, 100 feet wide at most places, enters the subdivision at the northeast corner and curves to a southerly course one block west of the trafficway and proceeds to 35th Street on the south. West of Karnes Boulevard the addition is isolated, containing no through streets, with bluffs on the northern, western and southern extremities. Part of the subdivision was excepted from the operation of the ordinance. Due to the difference in elevation between the excepted properties and the rest of the subdivision the former, which are located "many hundreds of feet" below the residential area, "may just as well be five miles away." The subdivision was variously described as a very hilly, woody, beautiful area of residential quality; the best, or one of the finest, residential districts north of 35th Street; close to the center of the downtown area; a desirable place in which to live today; containing a large number of families with children; one that for forty years has been a stabilized community with small turnover

of property owners and which has not decreased in desirability as a residential area in the past 25 years. The "houses, roofs, paint it is excellent, even better than most of Country Club." Most of the houses are large, 2½-story residences containing from 10 to 14 rooms. A real estate expert conducted a study of sales of 53 properties lying on the east side of Karnes Boulevard from 31st to 35th Streets, and on the west side of Karnes from 31st to 32nd Terrace. Two had been held for 45 years; 8 from 26–31 years; 12 from 17–25 years, 7 from 12–16 years and 25 from the present to 11 years. A study of 44 tracts lying on the west side of Southwest Trafficway between 31st and 35th Streets revealed that 5 had been held from 43–54 years; 2 from 32–42 years; 6 from 22–32 years; 14 from 12–22 years and 17 from the present to 11 years. This expert also testified that this had always been a fine residential area; that demand continues to be "good and strong" for houses in this subdivision; that if a "for sale" sign goes up, whether on the trafficway or interiorally, the property will sell at appreciated values "if it is at all realistically priced." He was of the opinion that imposition of a single-family occupancy restriction would not damage or decrease the value of residence properties in the subdivision but would stabilize the neighborhood and benefit the city at large; that the subdivision is unique and the values of properties have been kept up in spite of the fact that some properties have been converted to income use. Properties on the trafficway that continue to be used for single-family occupancy continue to be desirable for that purpose. Their owners are not complaining and the properties are not for sale. "When they are for sale they turn quickly" and they "bring more money every year." Property values in the subdivision have appreciated. (Condemnees, on the other hand, testified that while some of the properties in the area have sold as single-family homes since 1961, some have been a "drug on the market.") Various property owners valued their properties at from $14,000 to $40,000. The increased

traffic caused by the construction of the trafficway in 1949, and its subsequent use (a 24-hour traffic count in March, 1965 showed 17,000 northbound and 17,300 southbound cars daily; parking is no longer permitted on the trafficway), and the increased traffic on Karnes Boulevard (heavy traffic during the morning and evening rush periods, augmented by southbound traffic making right-hand turns through the subdivision along Karnes Boulevard in order to proceed east on 31st Street), have rendered the properties fronting on the trafficway, and to a lesser degree those fronting on Karnes Boulevard, less suitable or unsuitable for single-family residence uses. Some of these residences along the trafficway and Karnes Boulevard have been converted into apartment houses, for the production of income. Condemnees testified that eight of the properties on the trafficway and on Karnes Boulevard were used for apartments; four as duplexes, one as a nursing home, one as a 3-family residence, two as development properties and one was under construction as a combination residence and architectural engineer's studio. There was evidence that some of the properties along these streets have been producing income and have been used as multi-family buildings since 1918 or 1919. Some of these uses were in existence when the 1943 ordinance was passed. There was evidence that no attempt was ever made to enforce that ordinance and that the city made no effort to eliminate these uses until after the passage of the ordinance now challenged, which was passed on December 6, 1963. There was evidence that in an area of this kind the conversion of homes into apartments and rooming houses damages the area and in time will ruin it.

Twenty-one property owners testified to or filed claims for damages. Thirteen owners had acquired their properties since 1960. Fourteen of the properties were income-producing. Three were unimproved. One had apartments which had been discontinued. One was occupied by an employee as part of her salary. Various property owners testified to the cost of remodeling and reconverting these from multiple-family to single-family use. Their estimates ran from $700 to $10,000. City employees conducted a survey which showed on the trafficway 12 units without apartments; 6 units containing 1 to 5 apartments; 1 unit in which roomers were kept; and on Karnes Boulevard 16 units without apartments; 3 units with 1 to 7 apartments; 1 duplex and 1 unit where roomers were kept. Four additional units with apartments and 1 additional duplex on Karnes Boulevard were testified to. There was evidence that the highest and best use of the properties fronting on the trafficway are for commercial purposes and that the value of this property is $500 a front foot for commercial purposes. There was evidence that the value of the properties located on the trafficway and on Karnes Boulevard would be materially greater for multi-family occupancy than for single-family use. For example, a property bought in 1957 for $19,500, used as several apartments, to which improvements of $2,250 have been added, might bring $22,500 today, but that the owner would be "lucky" to get $12,000 or $13,000 for it if it had to be sold as a single-family home. An owner of a 60-foot vacant lot on the trafficway testified that it was worth $500 to $600 a front foot ($30,000 to $36,000) if zoned for commercial purposes, but is worth only $1,500 for residential purposes with the restrictive ordinance in force. For many years no houses have been built upon lots fronting upon the trafficway. None are presently under construction. The Federal Housing Authority will not lend money on houses there situated. There is a constant deposit of trash and debris, such as cigarette butts, beer cans and cartons, on the pavement in front of the houses located along the trafficway. Most of the houses are located only 20–30 feet from the street, which is a 3-lane trafficway. There is no parkway and there are no shade trees or grass along this area, as there were on Summit Street before 1949. The Director of City Planning testi-

fied that a restriction of the properties along the trafficway to single-family dwellings would have a blighting effect upon these houses and would cause a deterioration. He favored multi-family residential zoning for the area between Karnes Boulevard and the trafficway, but opposed rezoning the trafficway for commercial purposes. Another expert on city planning was of the opinion that the area between the trafficway and Karnes Boulevard should be zoned for multi-family dwellings and split off from the remainder of Coleman Highlands. He recommended against the condemnation procedure employed by the city. There was testimony that if houses now divided into apartments were forced to be converted to single-family homes their owners would not be financially able to maintain them, and that they would deteriorate; that a man and his wife would have no use for 9 or 10 bedrooms, and would be forced to sell at a sacrifice—to take whatever they could get; that these properties on the trafficway cannot be sold as a single-family home; that if the single-family occupancy restriction remains in effect and is enforced the neighborhood will deteriorate rapidly, and the subdivision as a whole will be damaged.

Zoning in Coleman Highlands Addition is R2a (2-family dwelling, low density). Several recent efforts to rezone properties fronting on the west side of the trafficway for commercial usage met with failure. Zoning in the surrounding areas is as follows: To the north C2 (local retail business: a service station and WDAF radio station and tower); and north of that M1 (light industrial). Northeast, across 31st Street and the trafficway, CP–1 (high-rise administrative, professional and research; the 17-story BMA office building is located in that area). This is a square flanked by Penn Valley Park, which is zoned R4 (low apartments). To the east, from 31st to 35th Streets, R4, except for two lots immediately north of 33rd Street, and the area between 33rd and 34th Streets, which is zoned C2. This area to the east of the trafficway is mostly small homes. An advertising agency occupies a small corner building on the southeast corner of 32nd Street. There are a few small stores at the corner of 33rd Street and southward toward 34th Street. To the west, below the bluff, the adjoining lands are zoned M2a (heavy industrial). To the south lies Roanoke Park and Roanoke, a restricted residential district of fine homes (zoned R2a, as is the area to the southeast). To the southwest, below the bluff, the adjoining area is zoned M2a (heavy industrial). Penn Valley Park contains about 250 acres. Roanoke Park, which is about one third the size of Penn Valley Park, contains recreational equipment and a community center (a multi-purpose recreational center). Subdivision properties excepted from the operation of the ordinance, located on the north and west sides, are owned by Downtown Industrial Park and are presently unused.

Two principal questions have been raised on this review: whether these proceedings are within the charter powers of Kansas City and whether they are for a public purpose and use. Another question inheres in the case: whether the imposition of the restrictions promotes the health, safety, morals and general welfare of the community.

By the passage of the ordinance in question the city has undertaken *zoning with compensation.* One of the recognized attributes and functions of zoning is the regulation and restriction of the use of buildings within a designated district. §§ 89.-020, 89.030, RSMo 1959, V.A.M.S. The declared purposes and objectives of the ordinance and its principal provisions correspond with several of the purposes and objectives of municipal zoning as set forth in § 89.040, RSMo 1959, V.A.M.S., to-wit: "* * * to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population * * *," and follow the mandate in the last sentence of § 89.040 that zoning

regulations shall be made "with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality." After reciting the history of restrictions on lots in the subdivision, the exclusive use of the buildings for residential purposes and the "overwhelming sentiment and belief" of property owners, citizens and city council, the stated purpose in imposing the single-family occupancy restriction is to "enhance and stabilize the value and utility of each and every piece of property within the district," to maintain property values for the purpose of public taxation, and to "promote the health and welfare of the City, as well as add to the beautification" of the city and subdivision. In designating a substantial part of a subdivision as an appropriate area for the regulation of the uses of property for the purpose of "stabilizing the value and utility" within the district and to "maintain property values" and "promote the health and welfare of the city," the ordinance follows closely the language of § 89.040, supra.

■ Zoning with compensation is a joint exercise of the power of eminent domain and the police power. It is zoning with extraordinary consideration for the property owners involved for it compensates those whose property rights are taken in the process, whereas in conventional zoning the individual who suffers hardship because of special circumstances receives no compensation. The theory of noncompensation in lawful conventional zoning is that the private interest is subordinate to the public good. State ex rel. Oliver Cadillac Co. v. Christopher, 317 Mo. 1179, 298 S.W. 720 [6]. While unusual, zoning with compensation is not without precedent in this state and elsewhere, and we find no constitutional or statutory provision which prohibits the blending of the two powers (eminent domain and police power) in the

same legislative enactment if it is otherwise done in a constitutional manner.

■ The scope of review in such a case, however, should be modified in the interest of according full protection to every affected property owner. In reviewing conventional condemnation proceedings the judiciary considers the question whether the proceedings are for a public use and purpose but will not inquire into the necessity, expediency or propriety of the exercise of the power of eminent domain. The latter are questions for the legislative body to determine and are not the subject of judicial inquiry, absent fraud or bad faith. In re Armory Site in Kansas City, Mo. Sup., 282 S.W.2d 464; Bowman v. Kansas City, 361 Mo. 14, 233 S.W.2d 26; City of Kirkwood v. Venable, 351 Mo. 460, 173 S.W.2d 8. If the proceeding is for a public use it will be sustained; if it is for a private use the proceeding must fall because with certain exceptions not here applicable private property may not be taken for private use, with or without just compensation. Article I, § 28, Constitution of Missouri 1945; In re Coleman Highlands, supra.

■ In reviewing conventional zoning ordinances, which involve the exercise of the police power, the courts inquire whether the regulation or restriction bears a substantial relation to the public health, safety, morals or general welfare of the community; whether the restriction has a fair tendency to accomplish or aid in the accomplishment of some purpose for which the city may exercise its powers, and whether the zoning ordinance is arbitrary and unreasonable. If the evidence indicates that the issue is fairly debatable the zoning ordinance will be upheld. Flora Realty & Investment Co. v. City of Ladue, 362 Mo. 1025, 246 S.W.2d 771, 778 [2].

■ In this case, in which both of these powers (eminent domain and the police power) are exercised in the passage of the same ordinance, and where a negative re-

striction upon the use of property is concerned and the possession, occupancy, employment or enjoyment of property for the use of the public is not involved, we will review not only the question whether the use is for public or private purposes but also the question whether the restriction bears a substantial relation to the public health, safety, morals or general welfare of the community and whether it is clearly arbitrary and unreasonable.

We start out recognizing that the ordinance is presumed to be valid and the burden of establishing its unreasonableness, Flora Realty & Investment Co. v. City of Ladue, supra, and that it represents the taking of private property for a private use, Downing v. City of Joplin, Mo.Sup., 312 S.W.2d 81; In re Armory Site in Kansas City, supra, is on the contestants.

Attending to the question of power, there is no question that the ordinance in question is within the charter powers of the city. As pointed out in our previous opinion, 401 S.W.2d, 1.c. 387, "Kansas City is given the following general power of condemnation by Article 1, § 1(9) of its Charter: 'To exercise the right of eminent domain and to condemn property, real or personal, or any right, interest, easement, restriction or use therein, within or without the city or state for any public or municipal use or purpose.'" This broad grant includes the power to condemn the use of dwellings and to impose restrictions thereon if done for a public or municipal use or purpose. That Kansas City also has the power to enact valid zoning ordinances is unquestioned. Charter of Kansas City, Article I, § 1(55).

Turning to the principal question, the issue is two-fold: whether the primary, paramount and dominating purpose of the ordinance and the imposition upon all buildings in the subdivision of single-family occupancy restrictions is for a public use and purpose, that is to say, for the use and benefit of the subdivision or of the city as a whole or for the private use and benefit only of those property owners in the subdivision who desire to maintain their property for use for single-family occupancy; and whether the restriction bears a substantial relation to the public health, safety, morals or general welfare or is arbitrary and unreasonable.

Obedient to Article I, § 28 of the Constitution of Missouri we disregard the legislative declaration that the use is public insofar as the preamble of the ordinance so declares and confine our examination to the pleadings and evidence, considered in the light of the objections of the contestants. They are principally property owners whose buildings have been converted for use for multi-family occupancy for the production of income. Most of them own properties facing on Karnes Boulevard or Southwest Trafficway. They claim that while the area of the subdivision west of Karnes Boulevard and the use of the residence buildings therein for single-family occupancy during the past forty years have remained largely unchanged, the area bounded by Karnes Boulevard and the trafficway has changed materially, particularly during the past twenty years, due to the great increase of traffic flow and the conversion of use of many of the buildings from single-family occupancy to income-producing apartments, duplexes, a nursing home and development properties; that this area within the subdivision is no longer suitable for use for single-family occupancy; that restricting the use of their properties would have a blighting effect upon the buildings and cause a deterioration; and that the purpose of the condemnation action is "to benefit a few selected landowners in the western part" of the subdivision by making the area bounded by Karnes Boulevard and the trafficway into a "buffer zone" for the private protection and benefit of the properties to the west at the expense and to the great damage of those who oppose the proceedings—that the single-family occupancy restriction will result in hardship cases and financial loss for those who have converted their

properties to multi-family use, and that the property fronting on the trafficway and the east side of Karnes Boulevard should be rezoned for commercial purposes so as to permit the highest and best use of the land.

While these claims had support in the evidence the emphatic contention of contestants that the purpose of the ordinance is to make the area surrounded by Karnes Boulevard and the trafficway into a buffer zone for the private protection and benefit of those residents whose properties lie west of Karnes Boulevard was not established beyond question or debate.

This is not a case like State ex rel. Gove v. Tate, Mo.Sup., 442 S.W.2d 541, where the condemnation of a sewer right of way over private land would serve only one property owner, or State ex rel. United Rys. Co. v. Wiethaupt, 231 Mo. 449, 133 S.W. 329, and Kansas City v. Hyde, 196 Mo. 498, 96 S.W. 201, 7 L.R.A.,N.S., 639, where elements of fraud were present, or Huttig v. City of Richmond Heights, Mo.Sup., 372 S.W.2d 833, which presented a factual situation of unreasonableness in the extreme and beyond debate. This is a case in which a relatively few property owners will be deprived of their right to use their properties as they wish, and where the advantage enjoyed for years by a comparatively large number of property owners will be continued for 20 years (unless the ordinance is repealed during that period), but " '[e]very valid exercise of the police power is apt to affect the property of someone adversely.' " Huttig, supra, 372 S.W.2d, l. c. 839, and the fact that special benefits or advantages accrue to a group of individuals as a result of an eminent domain proceeding does not detract from or deprive it of its public character. Arata v. Monsanto Chemical Co., Mo.Sup., 351 S.W.2d 717, 721. As in the case of benefits accruing to private individuals as a result of a redevelopment project, "any benefits to private individuals are merely incidental to the public purpose." State on

Inf. of Dalton v. Land Clearance for Redevelopment Auth., 364 Mo. 974, 270 S.W. 2d 44, 53. It is not necessary that the whole community or any large part of the community be benefited by the condemnation. It is sufficient if there is a benefit to any considerable number. Bowman v. Kansas City, supra, 233 S.W.2d, l.c. 33; Laret Inv. Co. v. Dickmann, 345 Mo. 449, 134 S.W.2d 65, 68. By this enactment the city council has continued in effect what has been in existence for more than 40 years, namely, a setting apart of this restricted residential district and a separation of this from the surrounding area, such as that immediately east of the subdivision (on the east side of the trafficway) which is zoned R4 and C2 and which the evidence shows has deteriorated markedly in the last 20 years. From a consideration of all the evidence we cannot say that the restrictions imposed by this ordinance bear no substantial relation to the public health, safety, morals and general welfare of the community, or that this exercise of the police power is arbitrary and unreasonable, or that the ordinance was enacted for any fraudulent purpose. On the contrary, we consider the question not only fairly debatable, but that the evidence preponderates in support of the conclusion that the restrictions are fairly within the bounds of the police power.

This subdivision, in its entirety, was set apart as a unique and highly desirable residential section, with restrictions intended to insure its stability and value as a place in which large families could be raised in an attractive area. Within the past 20 years the development of the trafficway on the east side of the subdivision, the traffic pattern that developed around Karnes Boulevard, and the demand for close-in housing, concomitant with lax enforcement of the zoning restrictions, have resulted in the conversion of several of these fine old homes into apartments and an increase in the value of the properties fronting on the trafficway for commercial purposes, but the great

majority of the homes in the subdivision continue to be occupied as single-family residences. The owners of these properties, and the public generally in the city, will be benefited by continuing in effect the restrictions previously imposed by the 1943 ordinance and thereby preserving the distinctive residential character of this area. The restrictions are designed to benefit the community at large by maintaining this subdivision as the finest and best residential district within easy access of downtown Kansas City, sustaining property values for the purposes of public taxation and maintaining wholesome and harmonious surroundings in a stabilized and beautiful residential area; by preventing congestion and overcrowding; by banning billboards and filling stations; by preventing deterioration of the subdivision by the invasion of rooming houses and the occupancy of these fine old homes by numerous families crowded together. While there was credible evidence that the market value of the properties fronting on the west side of the trafficway for use for single-family occupancy has not been adversely affected by the restrictions, doubtless some hardship and economic loss will be sustained by some property owners, but there is the redeeming feature that the ordinance provides relief by way of compensation for all demonstrable substantial damages sustained by them.

Approval of the restrictions as a proper exercise of the police power redounding to and promoting the general welfare implies a finding that the paramount and dominating purpose in imposing these restrictions is for a public use. The action of the circuit court in striking down this ordinance as unconstitutional must be set aside.

There is precedent in this state and elsewhere for zoning with compensation. In 1923 in Kansas City v. Liebi, 298 Mo. 569, 252 S.W. 404, 28 A.L.R. 295, this court sitting en banc, with two judges dissenting, held that a city ordinance of Kansas City passed in 1893 providing for a building line 35 feet from Gladstone Boulevard (for a distance of about three miles), prohibiting buildings other than for residential purposes along the boulevard, prohibiting gasoline tanks of capacity of more than 100 gallons, filling stations and billboards and providing compensation for any person damaged by such restrictions, was constitutional. The preamble and principal provisions of the 1893 ordinance are so similar to those in the instant case that it is evident that the former was used as a model in drafting the latter. The evidence in support of the 1893 ordinance was essentially similar to that introduced in the instant case. There, as here, it was contended that the ordinance did not have for its purpose a public use of the property affected. Rejecting the theory that "public use" in condemnation implies the possession, occupancy, employment or enjoyment of the land condemned, the court adopted the more liberal interpretation of the term and held that a taking for public use when applied to land is not limited to actual occupation by the public; that "[a]ny regulation which imposes a restriction upon the use of property by the owner, and any neighboring public improvement which tends to impair the enjoyment of property by affecting some right or easement appurtenant thereto, may be, under certain circumstances, a public use within the meaning of the Constitution"; that the enactment was in the interest of the health, safety, morality, general enjoyment and education of the community; that it did not contravene Constitution of Missouri, Article II, §§ 20, 21 and 30, [now Article 1, §§ 10, 26, 28], or the Fourteenth Amendment to the Constitution of the United States, as a taking of property for private use, or the taking of property for public use without just compensation; and that the city had the authority under its charter and the condemnation statute to establish residential restrictions along a boulevard.

■ We cannot accept contestants' attempt to distinguish the Liebi case on the

ground that the effort there was to preserve a unique boulevard "as a public parkway" which possessed historic interest and esthetic value, based on the theory that the creation of a public *park* is a public purpose. No property was condemned for the creation of a public park. A restriction was placed upon the use of buildings along a 3-mile stretch of boulevard for the purpose of preserving the attractiveness of the boulevard and enhancing the value of adjacent properties. In the case before us a restriction has been placed upon the use of dwellings within a sizeable subdivision—a broader and more extensive zoning area than a portion of one boulevard—for the purpose of preserving the character and distinction of an entire neighborhood and of enhancing and maintaining property values therein. The Liebi case, precisely in point, states a rule which has stood the test of time. Its liberal approach is entirely consistent with the enlightened philosophy of the later cases in which statutes and ordinances providing for the taking of private property for land clearance and urban redevelopment purposes, with the object of eliminating blighted areas, have been sustained as having been constitutionally enacted for the public uses and purposes. State on Inf. of Dalton v. Land Clearance for Redevelopment Auth., supra; Annbar Associates v. West Side Redevelopment Corp., Mo.Sup., 397 S.W.2d 635. If private property can be taken for the public purpose of eliminating blighted conditions which have already developed and which threatened the general welfare and depreciate property values (with "consequent progressive diminution of tax revenues," Annbar, 397 S.W. 2d, l.c. 639 [1.]), the use of private property can also be restricted for the public purpose of preventing the deterioration of a neighborhood and the depreciation of property values that lead to blighted conditions.

There is authority elsewhere for zoning with compensation. In State ex rel. Twin City Bldg. & Inv. Co. v. Houghton, 144 Minn. 1, 174 N.W. 885, 176 N.W. 159, 8 A.L.R. 585, a resolution of a city council designated block 8 in an addition to Minneapolis as a restricted residence district. A state statute authorized cities of the first class to designate restricted residence districts and to acquire by eminent domain the right to exercise the powers granted by the act. The question was the constitutionality of the statute under a constitutional provision that "Private property shall not be taken, destroyed or damaged for public use, without just compensation therefor first paid or secured." Commenting on the negative character of the use; that the public gets no physical use of the premises and cannot travel upon or occupy them; that the taking consists in restricting the use of the ground with compensation for the restriction imposed, and that only a small part of the public is appreciably or directly benefited, the court held that the restrictions constituted a taking for a public use. The opinion pointed out that the act itself implies that the restricting "is deemed to be for a public use" since condemnation is employed to achieve the desired end.

In Attorney General v. Williams, 174 Mass. 476, 55 N.E. 77, 47 L.R.A. 314, a legislative act prohibiting erection of buildings over 90 feet high on the streets adjoining a public park, and providing compensation to the owners of the servient estates, was upheld as constitutional. The court held that the act was intended as a taking of rights in property for the benefit of the public who used the park; that "* * * if the legislature, for the benefit of the public, was seeking to promote the beauty and attractiveness of a public park in the capital of the commonwealth, and to prevent unreasonable encroachments upon the light and air which it had previously received, we cannot say that the lawmaking power might not determine that this was a matter of such public interest as to call for an expenditure of public money, and to justify the taking of private property." 55 N.E., l.c. 78. In In re City of New York, 57 App.Div. 166, 68 N.Y.S. 196, a law widening a street 20 feet on each

side, not for use as a travelway, but reserving the added space for ornamental courtyards, and providing compensation to the landowners, was held constitutional as a taking for a public purpose. The court said, 68 N.Y.S., 1.c. 200: "Conceding that the legislature has the power to increase the width of Clinton Avenue; that it would be justified in taking possession of private property for this purpose upon the payment of just compensation—we are of opinion that it has a right to take a lesser estate in the property than would be necessary for a complete dedication to the use of the public, and that the use is none the less public, to the extent to which the property is taken, because it is left in the partial control of the present owners."

The remaining question is the propriety of the action of the court in awarding a fee to attorney Don M. Jackson. In the early stages of this proceeding Mr. Jackson represented a number of defendants as their personal, employed attorney. Later he formally withdrew as their counsel. On the day of trial before the jury of freeholders the record indicates that Mr. Jackson appeared "at the request of the Court" in behalf of thirteen condemnees. Shortly after the taking of testimony commenced Mr. Jackson told the court that he was there only to "unofficially" advise eight or nine condemnees who were ready to put on testimony. One of them took the stand and began a narrative statement. It became apparent that the only orderly way to proceed was by asking questions of the witnesses in the usual manner of eliciting testimony. The court suggested this to Mr. Jackson, who indicated that while he was in an unusual position he would be happy to do so. The court then stated: "Maybe I have authority over you to direct you to ask the questions." Acceding, Mr. Jackson proceeded to develop the evidence of a dozen condemnees, conducted 179 pages of direct and redirect examination, 46 pages of cross-examination, made 65 objections to evidence offered by the city,

and argued against the city's objections on 14 different occasions. He effectively assisted in the orderly, logical and efficient presentation of the cases of numerous condemnees. During the course of the trial he stated that he was "performing [his] duties to [his] clients," and did not purport to be acting as an amicus curiae until he so alleged in his motion for a directed verdict. In his motion for allowance of a fee he alleged that he was requested and directed by the court to participate for the purpose of assisting the court in the presentation of evidence and that he assisted the court in reaching a proper conclusion in the litigation and as such rendered services in the capacity of an amicus curiae. The court at no time used the term "amicus curiae" until its order allowing a fee, which recited that it was "for services rendered to this Court in the capacity of amicus curiae during the trial of this action."

Ordinarily an allowance of attorney's fees depends upon the authority of a statute. One exception is an allowance to an amicus curiae appointed as an aid to the court to assist, advise and make suggestions to the court "in a case pending before it with respect to material matters about which the court is in doubt. What we have said has no reference to one who, while formally purporting to act as a friend of the court which grants him leave to appear and be heard, is actually representing a private client with a personal interest in the ultimate result which is reached." In re Phi Fathers Educational Ass'n, 239 Mo.App. 1105, 203 S.W.2d 885, 887. An amicus curiae is not appointed as the private counsel of parties to an action to represent them in a partisan manner and for their personal use and benefit. His is not the function of taking over the conduct of the case for parties litigant. "An amicus curiae is not a party and cannot assume the functions of a party, an attorney for a party, or even a partisan." 4 Am. Jur.2d Amicus Curiae, § 3, p. 111.

■ Mr. Jackson functioned very effectively as the representative of several condemnees, marshaling and assembling the evidence, eliciting testimony and cross-examining opposing witnesses and presenting the cause of the condemnees in the very best light possible. In that sense, i. e., in the orderly and intelligent presentation of the case, he rendered assistance to the court, the same as any attorney who contributes to the orderly presentation of a case. He was appearing, however, not as an adviser to the court but as a representative of private litigants who had a direct financial interest in the outcome of the case. He was advancing their partisan interests with the objective in view of winning the case for them. In such case he must look to the parties litigant for compensation and is not entitled to have the fee for his admittedly valuable and competent professional services taxed as costs on the theory that he was acting as amicus curiae.

The judgment of February 19, 1968 is reversed. The cause is remanded with instructions to set aside that judgment and enter a new judgment reinstating and confirming the verdict of the jury of freeholders and entering judgment thereon for condemnor under Article VI, § 156 of the Charter of Kansas City, and overruling the motion for an attorney's fee.

WELBORN, C., concurs.

HIGGINS, C., not sitting.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

SEILER, P. J., and HOLMAN, J., concur.

STORCKMAN, J., absent.