**CITY OF KANSAS CITY,**
Missouri, Appellant,

v.

**Stephen HON, et al., Respondent,**

**Unborn and Unknown Heirs,**
**Respondents.**

No. WD 54099.

Missouri Court of Appeals,
Western District.

April 21, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 2, 1998.

Application for Transfer Denied
Aug. 25, 1998.

Walter J. O'Toole, Acting City Atty., Dorothy L. Campbell, Asst. City Atty., Kansas City, for appellant.

Jerome E. Brant, Steven D. Wolcott, Liberty, Quint Shafer, Weston, for respondents.

Before LAURA DENVIR STITH, P.J., and HANNA and RIEDERER, JJ.

LAURA DENVIR STITH, Presiding Judge.

The City of Kansas City, Missouri, appeals the trial court's denial of its Petition seeking to condemn eight tracts of land in Platte County for the purpose of expanding Kansas

City International Airport. We find that the trial court erred in its determination that the condemnation was neither for a public use nor necessary to effectuate that use. Therefore, we reverse the judgment and remand for further proceedings in condemnation consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACK-GROUND

On October 5, 1995, the City Council of the City of Kansas City, Missouri, passed Ordinance No. 951275. The ordinance declared it was necessary for the city to acquire, by either purchase or condemnation, fee simple title to eight tracts of land in Platte County for the purpose of expanding Kansas City International Airport (KCI). Three of these tracts, designated as Tracts 101, 102E, and 102W, are completely within the city limits of Kansas City, Missouri. The remaining five tracts, designated as Tracts 116, 123, 124, 125, and 133A, are partially within the city limits and partially outside the city limits of Kansas City, Missouri (the City).

Attempts by the City to purchase the eight tracts from their owners were unsuccessful. On July 1, 1996, the City, therefore, filed a Petition in Condemnation seeking to condemn these eight tracts through use of the power of eminent domain. The owners of the eight tracts (Respondents) opposed the proposed condemnation. The circuit court held a hearing on September 16, 1996. On February 7, 1997, the trial court entered judgment against the City, denying condemnation of all eight tracts of land. This appeal by the City followed.

## II. STANDARD OF REVIEW

■ This Court will reverse the trial court's decision in a court-tried case such as this if the decision is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We defer to the trial court's findings of fact where the evidence is conflicting, but not to its determinations of law. *Id.*; *Osborn v. Home Ins. Co.*, 914 S.W.2d 35, 37 (Mo.App.1996).

## III. PRINCIPLES GOVERNING EMINENT DOMAIN AND CONDEMNATION

■ The power of eminent domain is the inherent power of a State to take private property. The power of eminent domain extends only to the taking of property for a public use, except in two specific instances which are not relevant here.[1] Eminent domain cannot be used by the State to involuntarily take private property for private use. Mo. Const. art. I, § 28; *State ex rel. Missouri Cities Water Co. v. Hodge*, 878 S.W.2d 819, 820 (Mo. banc 1994); *Osage Water Co. v. Miller County Water Authority, Inc.*, 950 S.W.2d 569 (Mo.App.1997). Moreover, the Missouri Constitution provides that such "property shall not be taken or damaged for public use without just compensation." Mo. Const. art. I, § 26.

■■ The burden is on the party seeking condemnation to prove both that the condemnation is for a public purpose and that it is a matter of public necessity. Both findings are jurisdictional prerequisites to condemnation.[2] *State ex rel. State Highway Comm'n v. Curtis*, 359 Mo. 402, 222 S.W.2d 64, 68 (1949); *State ex rel. Missouri Highway and Transp. Comm'n v. Perigo*, 886 S.W.2d 149, 152 (Mo. App.1994); Mo. Condemnation Practice, § 2.2 (Mobar 2d ed.1993). Both prerequisites must be satisfied separately.

■ Here, the power of eminent domain was exercised not by the State but by the City of Kansas City, Missouri. The power of eminent domain does not inherently belong to municipalities, but the State may delegate this authority to cities or other public and private entities, subject to constitutional limi-

---

1. Private property may be taken for private use "for private ways of necessity" or "for drains and ditches across the lands of others for agricultural and sanitary purposes." Mo. Const. art. I, § 28.

2. There is a third jurisdictional prerequisite that the condemnor negotiated in good faith with the property owner regarding the amount of compensation before seeking condemnation. That prerequisite is not at issue here.

tations. *Missouri Cities,* 878 S.W.2d at 820–21; *Osage,* 950 S.W.2d at 572.

The Legislature has specifically delegated the power of eminent domain to cities to acquire property to "establish, construct, own, control, lease, equip, improve, maintain, operate, and regulate, in whole or in part, alone or jointly or concurrently with others, airports or landing fields for the use of airplanes and other aircraft." §§ 305.170, 305.180 RSMo 1994. It has also specifically determined that condemnation for this purpose constitutes a public use and is a matter of public necessity, stating: "Any lands acquired, owned, controlled or occupied by such cities, villages, towns or counties for the purposes enumerated in sections 305.170 and 305.180 hereof shall and are hereby declared to be acquired, owned, controlled, and occupied for a public purpose and as a matter of public necessity." § 305.190 RSMo 1994.

The issue here is whether the circuit court erred in determining that the condemnation of the eight tracts at issue in this case was not for a public purpose and was not a matter of public necessity. For the reasons set forth below, we determine that the circuit court erred in its determination of both issues.

## IV. CONDEMNATION FOR AVIATION–RELATED PURPOSES CONSTITUTES A PUBLIC PURPOSE

▪ Appellant City argues that the condemnation was for a public purpose. In support, it notes that the legislature specifically determined in Section 305.190, quoted above, that condemnation for the purpose of an airport use is condemnation for a public purpose. Respondents counter that the legislature's finding that condemnation for airport-related purposes is a public purpose is of no import, for the Missouri Constitution requires that the courts make an independent determination of whether a condemnation is for a public use or purpose.[3]

▪ The Missouri Constitution does make the determination of whether a use is a public use a question for judicial rather than legislative determination. It specifically states that "[w]hen an attempt is made to take private property for a use alleged to be public, the question of whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public." Mo. Const. art. I, § 28. We, therefore, agree with Respondents that we, like the trial court, are required to make an independent determination whether the use at issue here is a public use.

▪ In so determining, neither the trial court nor this Court can give deference to the general legislative declaration in Section 305.190 that airport uses are public uses. *Arata v. Monsanto Chemical Co.,* 351 S.W.2d 717, 721 (Mo.1961); *Perigo,* 886 S.W.2d at 152. Rather, the courts must consider the evidence presented at the hearing on the condemnation to determine whether the purpose of the condemnation is a public one. *See City of Kansas City, Missouri v. Kindle,* 446 S.W.2d 807, 814 (Mo.1969). We believe the fact that the legislature has determined that airport uses are public uses is, however, one piece of factual evidence which we are entitled to consider in reaching our judgment, just as would be a contrary legislative determination. Such legislative findings are simply not determinative or entitled to deference.

In this case, the trial court determined as a factual matter that:

> the tracts of land sought to be condemned by the City of Kansas City, Missouri, are sought by Plaintiff primarily for future commercial, industrial-aeronautical-related developments and that Plaintiff was seeking to gain control of the proposed condemned tracts of land to avoid potential future incompatible development and to offer this property, for probable lease, to future potential developers of large aircraft-related industries.

The parties do not contest the sufficiency of the evidence to support these findings, nor could they. At the hearing on the condemnation, John Soloman, Director of Aviation for

---

**3.** Although the Missouri Constitution uses the term "public use," relevant statutes, ordinances, and case law use the terms "public use" and "public purpose" interchangeably.

the City, testified that the City desired to acquire the tracts so that it could expand the airport to its natural boundaries. The airport is currently bounded on the north and east by Interstate 29, except for a small portion of Tract 133A. The airport is bounded on the west by Interstate 435, except for an alcove containing the other seven tracts. Acquiring the land in question, thus, would expand the airport all the way west to Interstate 435 and north and east to Interstate 29.

Mr. Soloman also testified that condemning the eight tracts would protect the airport from incompatible development, protection which is not currently possible through zoning because a portion of the land sought to be acquired is not within the city limits of Kansas City, Missouri. To date, Platte County has cooperated with Kansas City in regard to zoning issues, but it would not be prudent to simply assume such cooperation will necessarily continue for the next twenty years. Good planning requires the City to condemn the property now and keep its use within the City's control.

Mr. Soloman and Douglas Johnson, Assistant Director of Aviation for the City, also testified concerning how and why condemning the tracts now was necessary for future airport development and why it would help make the airport self-sustaining, as federal law requires it to attempt to be. In particular, Mr. Johnson mentioned the City's prior negotiations with McDonnell Douglas for an aircraft manufacturing facility and an adjacent runway at KCI.

Mr. Soloman similarly testified to why the City needed the land, stating, "For a period of over 20 years, the city has contemplated owning the property to the natural boundaries to protect the airport from an incompatible development and to plan for the future development of the airport." He explained that by future development he meant that the City is obligated to operate the airport in as self-sufficient a manner as possible, and that to fulfill this obligation the City is "constantly looking at expansion potential and the development potential for aviation and aeronautical purposes on the airport."

The City's Master Plan for development of the airport designates the west side area where the eight tracts are located as High Development Priority for aviation related commercial/industrial uses such as the McDonnell Douglas facility, which, if successful, would have produced approximately 15,000 jobs for the community. While McDonnell Douglas did not ultimately build its facility in Kansas City, Mr. Soloman testified that the City wants to preserve the area it was considering so that it will be available for other similar uses which will benefit the community through the creation of jobs. He noted, in particular, that after the McDonnell Douglas opportunity, "we had an opportunity with another aircraft manufacturing company, in fact we're on a list of three cites to be considered for that and they wanted an even larger tract of property than McDonnell had asked, had requested."

Mr. Soloman further testified that because of the length of time it takes to acquire land and make it available for such aviation-related uses, the City concluded it needed to acquire the property now "so that we can move ahead with the development of aeronautical facilities on the airport to allow the airport to be as self-sustaining as possible, under all circumstances."

Mr. Soloman also explained that this is the way that major metropolitan airports are normally operated, and that Kansas City's airport is "in competition with almost every major airport in the country," that "airports throughout the country are trying to capitalize on economic development to help sustain the operating and maintenance cost of providing an airport facility," and that for this reason the City feels it is its "responsibility to be trying to look for the opportunities to develop the airport and its full economic potential to support and enhance the economic viability of the entire region."

This testimony clearly supported the trial court's determination that the tracts were sought for future commercial, industrial-aeronautic-related development and to avoid future incompatible developments, and we defer to the trial court's findings of fact in this regard. *Osborn,* 914 S.W.2d at 37. We do not defer to the trial court's determination of

issues of law, however. *Murphy*, 536 S.W.2d at 32.

The question whether the City's proposed uses of the land constitutes a public use is a legal rather than a factual question, and is a question for which the parties proffer widely divergent answers. Respondents claim that acquiring the land with a purpose of making it available for profit for use by aviation-related industries, such as aircraft manufacturing and the like, is a private use, for which the City is prohibited from condemning the land by the Missouri Constitution. Respondents imply that the only public use to which airport land can be put is for runways and terminals and that the City was not able to specifically prove what portion of the land would be used for these activities.[4] The trial court agreed, stating, "The Court further finds that the condemnation sought by Plaintiff to permit future commercial development of aviation-related companies, rather that [sic] specific runway development, is not a public purpose for which the condemnation may be permitted under the law."

The City argues that, to the contrary, public uses are not limited to only those uses which directly involve runways or terminal buildings. They point out that the definition of what constitutes a public use changes with time, and operating a modern airport requires land for aeronautical-related commercial and industrial facilities. They note that in the 1920's, when commercial air flights were new, litigants similarly challenged whether commercial air travel was itself of any public use. They suggested that air travel was only for the rich, and would never benefit the City as a whole. In the words of one litigant:

> It [an airport] will afford a starting and landing place for a few wealthy, ultra-reckless persons, who own planes and who are engaged in private pleasure flying. They may pay somewhat for the privilege. It will afford a starting and landing place

for pleasure tourists from other cities, alighting in St. Louis while flitting here and yon. It will offer a passenger station for the very few persons who are able to afford, and who desire to experience, the thrill of a novel and expensive mode of luxurious transportation.

The number of persons using the airport will be about equal to the total number of persons who engage in big-game hunting, trips to the African wilderness, and voyages of North Pole exploration.

. . . .

In the very nature of things, the vast majority of the inhabitants of a city, a 99 per cent. majority, cannot now and never can, reap any benefit from the existence of an airport.

*Dysart v. City of St. Louis*, 321 Mo. 514, 11 S.W.2d 1045, 1047 (1928) (quoting opinion of judge in earlier unreported hearing of case).

Of course, all would now acknowledge that the City as a whole has benefitted from having a public airport, including terminals and runways. Indeed, a major city could not survive and grow without the presence of such aviation facilities. But, Respondents say, and the court below found, even if airports have a public use and purpose, aviation-related industry is unnecessary and irrelevant to the airport's public purposes and benefits.

The City counters that, in light of the fact that the airport must pay for maintenance and development, and given today's business climate, to survive and thrive an airport also must be able to offer facilities for use of commercial or industrial, aviation-related developments. This may bring or keep industry in the City, and will provide a monetary base which can be used to provide funds for maintenance and improvement of terminals, runways, and so forth, and avoid incompatible uses. The fact that the proposed public uses may not all be limited to runways and terminals is not determinative, the City argues. Other aviation-related uses are also a

---

4. Respondents also argued that a portion of the land would be used to build a golf course. Mr. Soloman specifically testified that this was not true. Instead, he explained that the City Council had been discussing selling a portion of the land the City already owns at the south end of the airport to the Parks and Recreation Department to expand the adjacent Tiffany Springs Golf Course.

part of a modern airport and must be if the airport is to survive. As City attorney Walter O'Toole argued:

> Your Honor, I think the point that needs to be made is that commercial industrial uses related to airports are part and parcel of operating an airport in this day and age. The classic example is recently Kansas City very nearly was able to get McDonnell Douglas into an airport-related use adjacent to the airport. And that is the type of commercial industrial use that we need to be prepared for, we are seeking to be prepared for.

He stated that if the City is not successful in attracting such a company it might not need the land for a runway until after the turn of the century, but that "if the McDonnell Douglas proposition, if we were able to [have] success in getting McDonnell Douglas here on our airport, we would have required a runway right away."

Mr. O'Toole also explained why attracting of industry such as McDonnell Douglas is important to and an essential part of a modern airport operation, stating:

> Part and parcel of operating an airport in this day and age is being prepared for that type of thing and being able to go out and offer that type of service to big airport users.
>
> Kansas City's airport has been working toward this for many-many years. We have acquired all of the property to the south that we need and a very-very large part of the property to the west that we need so that we will be in a position to offer these things *and offer them now.*
>
> But [if] you have to go to somebody and say "You can come to our airport, but only after a period of time during which time we will go out and acquire the property needed," you're going to lose this type of thing.

(emphasis added).

For that reason, Mr. O'Toole stated, aviation-related development and planning for such development is "an airport use," for:

> *It's the way airports are operated these days. It's what we have been planning*

*for—for many years. I think its clearly within the scope of our condemnation.*

> *It's not for a runway in the year 2000—whatever. What we're condemning for is so we can [go] out tomorrow and say to these big users, "Our airport has this capacity."*

(emphasis added).

We agree that the trial court erred in ruling that such aviation-related uses do not fit within the definition of a public use. As we noted in *J.C. Nichols Co. v. City of Kansas City,* 639 S.W.2d 886 (Mo.App.1982), what constitutes a public purpose should be given a broad and flexible rather than a narrow definition. In *J.C. Nichols,* the City sought to lease an abandoned fire and police station to a private company for restoration, but the City's charter allowed the City to lease property only for a public or municipal use or purpose. In finding the use to be a public one, the Court said, "a definition or description of the limits of 'public use' is likely to vary with the character of [the] case." *Id.* at 890, *quoting, Kansas City v. Liebi,* 298 Mo. 569, 252 S.W. 404 (1923). The Court also noted that "no 'hard and fast rule' exists for determining whether a specific purpose is public or private. Instead, the term is 'elastic, and keeps pace with changing conditions.'" *Id.* at 891, *quoting, Bowman v. Kansas City,* 361 Mo. 14, 233 S.W.2d 26, 32 (1950).

Most importantly, *J.C. Nichols* held that the fact that a private company would also benefit from the use did not preclude finding the use to be a public one. *Id.* Many other cases and scholars have also concluded that the mere fact that private interests—for instance, the airline or air cargo company which builds the facility—may benefit from a particular use does not mean that the use does not qualify as a public use. As we stated in *Arata,* "[I]t is not necessary that the whole community or any large part of it should actually use or be benefited by a contemplated improvement. Benefit to any considerable number is sufficient.... Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character." *Arata,* 351 S.W.2d

at 721, *quoting, Kansas City v. Liebi,* 298 Mo. 569, 252 S.W. 404, 408 (1923). See also *Kindle,* 446 S.W.2d at 815; *Perigo,* 886 S.W.2d at 152.

Nichols also approves use of a broad and flexible approach to the determination of what constitutes a "public use," stating:

> eminent domain may be used to help a private enterprise if the primary goal of the taking leads to a project that will eventually promote the public welfare or advantage. Even if there is some incidental private benefit to the business, so long as the primary benefit is to the public, then the use for which the land is taken is one that is public.

2A Nichols on Eminent Domain § 7.07[1]. Nichols notes that this principle has been applied to a number of industries, and in particular that, "[o]wing to the necessity of local conditions, ancient customs, or state constitutional authorization, industries such as mining and logging operations, agriculture and irrigation, and manufacturing and general trade have been assisted through the use of eminent domain." *Id.* We apply this same type of rationale in legislation which permits private companies to redevelop "blighted" land taken by eminent domain. *See, e.g., State ex rel. U.S. Steel v. Koehr,* 811 S.W.2d 385 (Mo. banc 1991).[5] We see no reason why the interpretation of "public use" should be more narrow in the area of aviation-related development than it is in regard to other types of public uses. The fact that the City plans to acquire the land, in part, so that it can attract companies related to the operation and maintenance of the airport, such as air cargo companies and aircraft manufacturers, does not preclude a finding that the purpose of the acquisition is a public one. While presumably the company chooses to locate at KCI because it believes it will benefit from that location—there would be little purpose in it leasing the land otherwise—the primary purpose of the acquisition from the

City's point of view is to benefit the airport and the community. Mr. Soloman and Mr. Johnson testified that these developments would benefit the airport, would help the airport to be self-sustaining, and have the potential of creating thousands of jobs for the community. They also testified that the City needs the land now because it is competing with other cities to attract this kind of development.

While it is true, as the circuit court noted, that if the City is not successful in attracting development then it will not need to use much of the land for many years, this does not mean that the City's condemnation of the land so that it can be available for present and future aviation related uses is not a public use. Moreover, to a large extent, the circuit court's concern about whether the City needs the land this year, rather than five or ten years from now, is not relevant to the issue of public use, but rather to the separate question of whether there is a present necessity for the condemnation. We deal with that in the remainder of this opinion. We hold that the City's proposed condemnation is for a public use.

## V. WE DEFER TO THE DETERMINATION THAT THE CONDEMNATION IS NECESSARY TO EFFECTUATE A PUBLIC PURPOSE

■ Having determined that the proposed condemnation is for a public use, we now turn to the second prerequisite to use of eminent domain—a showing that the condemnation is necessary to effectuate the public use. Here, Respondents argue that the use of eminent domain was not necessary to effectuate the public purpose, because the City has other land it already owns which Respondents believe would be ample for its current needs, the City does not now have a need for an additional runway and does not now have industries clamoring for use of the land in question for aviation-related facilities,

---

**5.** These cases differ from the current one in that the court defers to the legislature's finding that a designated use is public in a case involving blight. *State ex rel. Dalton v. Land Clearance for Redevelopment Auth.,* 364 Mo. 974, 270 S.W.2d 44, 52 (1954). However, they demonstrate the principle that public and private purposes can co-exist. *See also Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594 (3d Cir.1991), *cert. denied,* 504 U.S. 955, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992) (taking of land for private railroad constituted public use under both the United States Constitution and Pennsylvania law).

and, unless a large aviation-related industry decides to relocate here, the City may not need the land for a runway for up to 20 years.

We disagree that the record shows that the City does not need the land now and will not need it for 20 years. Rather, the testimony, quoted in detail above, showed that the City believes that it needs to acquire the land now so that it can compete with other cities for the location of aviation-related facilities. Neither the fact that the City cannot guarantee that it will be successful in attracting industry to the airport, nor the fact that it will not need the land for a runway for passenger use for up to 20 years if it is not successful, means that it does not need the land now so that it can try to attract aviation related industry to the area.

 Even more basically, the court below applied the wrong legal standard in determining that the City had not met its burden of showing a present necessity for the condemnation. While a court does not defer to a legislative or political determination of what constitutes a public purpose, a court must defer to a political or legislative determination that the use of eminent domain is necessary to effectuate that public purpose *unless* the objecting landowner proves that the condemning party's claim of necessity constitutes fraud or bad faith. *Kindle,* 446 S.W.2d at 813; *City of Blue Springs, Missouri v. Central Development Ass'n,* 684 S.W.2d 44, 47 (Mo.App.1984); *Mapco, Inc. v. Williams,* 581 S.W.2d 402, 405 (Mo.App. 1979).

Here, there is no claim that the City committed fraud or acted in bad faith. Thus, the only question is whether the City or State has made a legislative determination of necessity. They have done so unequivocally. The statute authorizing condemnation for the purpose of operating an airport specifically states, "Any lands acquired, owned, controlled or occupied by such cities, villages, towns or counties for the purposes enumerated in sections 305.170 and 305.180 hereof shall and are hereby declared to be acquired, owned, controlled, and occupied for a public purpose and as a matter of public necessity." § 305.190. In addition, the City Council found in Ordinance No. 951275 that condemnation of the eight tracts of land was necessary for airport-related development.

For these reasons, the trial court erred in disapproving the use of eminent domain on the basis that the City may not immediately need to use all of this land for the airport. The fact that part of the land may be used in the future rather than immediately does not invalidate the necessity of the condemnation as found by the City and the State. Indeed, "the great preponderance of opinion is to the effect that an acquisition for future use is justified as based upon a present necessity." 1A Nichols on Eminent Domain § 4.11[2]. It was up to the City to make the legislative decision whether it needed to condemn the land now, regardless how soon it is successful in attracting aviation-related development to the land, in order to prevent inconsistent developments, which would make future utilization of the land by the airport more difficult. It made that determination in Ordinance No. 951275. Because there was no evidence the City committed fraud or acted in bad faith in so determining, the court below should have deferred to the City's determination of necessity.

For the reasons stated above, we find that the City's proposed use of the land is a public use and we defer to the City's determination of necessity. We, therefore, reverse the trial court's judgment and remand for further proceedings in condemnation consistent with this opinion.

HANNA and RIEDERER, JJ., concur.