STATE of Missouri ex rel. Velma P. JACKSON and Alicia D. Seabaugh, Co–Trustees of the Lyle James Lambert a/k/a James Lyle Lambert and Jessie P. Lambert Family Trust Dated October 27, 2010, Relators,

v.

The Honorable David A. DOLAN, Respondent.

No. SC 92717.

Supreme Court of Missouri, En Banc.

May 28, 2013.

Mark G. Arnold, Caroline L. Hermeling, Husch Blackwell LLP, St. Louis, Raymond C. Leible, Sikeston, for the trustees.

James M. Hux, Hux & Hux, Sikeston, for the port authority.

ZEL M. FISCHER, Judge.

The Southeast Missouri Regional Port Authority ("Port Authority") sought to purchase a 30.65–acre parcel of land owned by Velma Jackson and Alicia Seabaugh ("Trustees") in their capacity as trustees of the Lambert Family Trust. After negotiations with the Trustees failed, the Port Authority filed a petition for condemnation in the circuit court of Scott County seeking condemnation of the 30.65–acre parcel. The Trustees filed a motion to dismiss arguing that the sole purpose for the taking was economic development, in violation of § 523.271,[1] and that the taking was for a private use, in violation of article I, section 28 of the Missouri Constitution. After an evidentiary hearing, the circuit court ordered condemnation of the property. The circuit court concluded that the taking did not violate § 523.271 because, in addition to promoting economic development, the taking would facilitate construction of a loop track and would improve river commerce. The circuit court also concluded

---

1. All statutory references are to RSMo Supp. 2012 unless otherwise noted.

that the taking did not violate article I, section 28 because it served a public purpose and any aid provided to a private entity was incidental to such purpose.

The Trustees petitioned this Court for a writ of prohibition, arguing that the condemnation was unauthorized by law because it violated § 523.271 and article I, section 28. This Court issued a preliminary writ. Because the circuit court failed to find any purpose for the taking that is not included in the legislature's definition of "economic development," the proposed taking is in excess of the Port Authority's condemnation authority, and the preliminary writ of prohibition is made permanent.

### Procedural and Factual History

Velma Jackson and Alicia Seabaugh own 30.65 acres of undeveloped land in their capacity as Trustees. The 30.65-acre parcel abuts land owned by the Port Authority. The Port Authority is a political subdivision of the State of Missouri organized under chapter 68, RSMo, and has the authority to acquire property necessary to its purposes through the power of eminent domain pursuant to § 68.025.1(17).[2] The Port Authority is also authorized to "[c]onsider and adopt detailed and comprehensive plans for future development and improvement of its port districts and to coordinate such plans with regional and state programs," to conduct land reclamation and resource recovery, and to buy and sell real property and improvements and personal property necessary to fulfill its purposes. Sections 68.025.1(2), (15) and (16).[3]

The Port Authority operates a port district that encompasses Scott and Cape Girardeau counties. Within this district, the Port Authority owns between 500 and 600 acres of land. The Port Authority plays two roles with regard to the land it owns. First, it serves as a land developer by developing and leasing land to private companies. In this capacity, the Port Authority provides streets, sewers, utilities, railroad tracks, and access to the harbor contained within the port. The harbor

---

**2.** Section 68.025.1(17) states:

1. Every local and regional port authority, approved as a political subdivision of the state, shall have the following powers to: (17) Acquire rights-of-way and property of any kind or nature within its port districts necessary for its purposes. Every port authority shall have the right and power to acquire the same by purchase, negotiation, or by condemnation, and should it elect to exercise the right of eminent domain, condemnation proceedings shall be maintained by and in the name of the port authority, and it may proceed in the manner provided by the laws of this state for any county or municipality. The power of eminent domain shall not apply to property actively being used in relation to or in conjunction with river trade or commerce, unless such use is by a port authority pursuant to a lease in which event the power of eminent domain shall apply[.]

**3.** These sections provide:

1. Every local and regional port authority, approved as a political subdivision of the state, shall have the following powers to: (2) Consider and adopt detailed and comprehensive plans for future development and improvement of its port districts and to coordinate such plans with regional and state programs;

\* \* \*

(15) Acquire, own, construct, redevelop, lease, maintain, and conduct land reclamation and resource recovery, including the removal of sand, rock, or gravel, residential developments, commercial developments, mixed-use developments, recreational facilities, industrial parks, industrial facilities, and terminals, terminal facilities, warehouses and any other type port facility; (16) Acquire, own, lease, sell or otherwise dispose of interest in and to real property and improvements situate thereon and in personal property necessary to fulfill the purposes of the port authority[.]

itself is operated by a private entity on land leased by the Port Authority. In its second role, the Port Authority operates a six-mile railroad that connects with two separate rail carriers, Union Pacific and Burlington Northern Santa Fe. This six-mile railroad provides businesses in the area with the ability to transfer freight between barges and trains at the Port Authority's harbor.

In order to expand its facilities, the Port Authority decided to build a loop track that would enable it to handle unit trains. Unit trains are trains of around 100 cars that come from one shipper and are headed to one particular destination. The Port Authority's current track is insufficient to handle trains of this magnitude, and it hopes that by constructing a loop track it can reduce freight rates thereby promoting growth in jobs and commerce.

To fund the construction of the loop track, the Port Authority sought to condemn the 30.65–acre parcel of land owned by the Trustees. The Port Authority intends to lease all of the condemned land out to private entities. One such entity has agreed in principle to the terms of a lease.[4] This unnamed entity wishes to construct a tank farm on a portion of the Trustees' land that would hold liquid products for transfer between barge and rail or barge and truck. The Port Authority also has conditional leases in place with other prospective tenants that would build dry storage areas for cargo on the 30.65–acre parcel. None of the facilities would be open to the general public. The private entities would receive the income derived from these facilities.

In exchange for the lease, or as part of the lease,[5] each prospective tenant has agreed to provide funding for construction of the loop track. The loop track itself will not be constructed on the 30.65–acre parcel. The Port Authority does not need to condemn the land to have a place to construct the loop track. It already owns that land, but it lacks the funding to build the track.

After the circuit court ordered condemnation, the Trustees petitioned this Court for a writ of prohibition, arguing that the condemnation was not authorized by law because it violates § 523.271 and article I, section 28. This Court entered a preliminary writ of prohibition.

## Appropriateness of a Writ of Prohibition

■ Prohibition is a discretionary writ that may be appropriate to stop condemnation proceedings that are not authorized by law. *State ex rel. Broadway–Washington Assocs., Ltd. v. Manners*, 186 S.W.3d 272, 274 (Mo. banc 2006); *Tierney v. Planned Indus. Expansion Auth. of Kansas City*, 742 S.W.2d 146, 149–50, 157–58 (Mo. banc 1987).

## The Taking Does Not Violate Article I, Section 28 of the Missouri Constitution

■ Eminent domain is the power of the State to take private property and "is an inherent element of sovereignty." *St.*

---

4. At the condemnation hearing, the Port Authority refused to disclose the name of the entity with which it was negotiating. The Port Authority said such disclosure ran the risk of jeopardizing the project because a competing port would be able to woo the potential suitor away after ascertaining that the Port Authority was embroiled in the present litigation. As a result, the names of the prospective tenants do not appear in the record of this case.

5. Due in large part to the Port Authority's desire to keep its negotiating partners private, no leases or prospective leases were made part of the record.

*Louis, H. & K.C. Ry. Co. v. Hannibal Union Depot Co.,* 125 Mo. 82, 28 S.W. 483, 485 (1894). The Missouri Constitution currently has two separate constitutional provisions that recognize the power of eminent domain. Article I, section 26 of the Missouri Constitution provides "[t]hat private property shall not be taken or damaged for public use without just compensation." Article I, section 28 provides, with certain exceptions not relevant here,[6] "[t]hat private property shall not be taken for private use with or without compensation, unless by consent of the owner...." Article I, section 28 also provides that, "when an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public." Operating together, these constitutional provisions allow the State to exercise its inherent power of eminent domain so long as the purpose for which land to be taken is a public purpose and the State pays just compensation.

■■■ This case does not involve the State itself taking property. Under Missouri law, the State statutorily may delegate the power of eminent domain to municipalities or other government subdivisions. *State ex rel. Mo. Cities Water Co. v. Hodge,* 878 S.W.2d 819, 820–21 (Mo. banc 1994). The legislature made such a delegation to the Port Authority in § 68.025.1(17).

The Trustees argue that the Port Authority's proposed taking does not serve a valid public purpose; therefore, the Port Authority is seeking to take private property for private use in violation of article I, section 28. The Trustees argue that, because the land will be leased to unknown private entities, those entities will receive the primary benefit, and no true benefit will inure to the public.

Missouri long ago abandoned an interpretation of "public use" that required actual use or occupation by the public. This Court instead has embraced a much broader interpretation of "public use." In *In re Kansas City Ordinance No. 39946,* this Court held:

> In order to constitute public use, it is not necessary that the whole community or any large part of it should actually use or be benefited by a contemplated improvement. Benefit to any considerable number is sufficient. Nor does the mere fact that the advantage of a public improvement also inures to a particular individual or group of individuals deprive it of its public character.

298 Mo. 569, 252 S.W. 404, 408 (banc 1923) (citation omitted). *See also In re Coleman Highlands,* 401 S.W.2d 385, 388 (Mo.1966) ("We do note that ... [this] Court adopted what it described as a liberal and flexible interpretation of 'public use' which, it said, was synonymous with 'public advantage' or 'public benefit,' and did not require that there should be an actual use or occupation of the land by the public or a public agency."); *Arata v. Monsanto Chem. Co.,* 351 S.W.2d 717, 720–21 (Mo.1961) (citing *In re Kansas City Ordinance No. 39946,* 252 S.W. at 408); *Bowman v. Kansas City,* 361 Mo. 14, 233 S.W.2d 26, 32–33 (banc 1950). A majority of other state courts have embraced a similar interpretation. *2A Nichols on Eminent Domain* § 7.02[5] (3d ed.2008).

Significantly, the United States Supreme Court has broadly interpreted "public use" as used in the federal takings clause of the Fifth Amendment to the

---

**6.** Article I, section 28 provides exceptions to the general rule for "private ways of necessity" and "drains and ditches across the lands of others for agricultural and sanitary purposes."

United States Constitution.[7] In *Hawaii Housing Authority v. Midkiff,* the United States Supreme Court approved the taking of land to regulate a land "oligopoly and the evils associated with it." 467 U.S. 229, 241–42, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). In *Midkiff,* a Hawaii statute sought to transfer fee title in property from the lessors of land to its lessees in order to reduce the concentration of land ownership. Hawaii claimed that the condemnation's purpose was to eliminate the "social and economic evils of a land oligopoly." *Id.* The Court of Appeals for the Ninth Circuit found that the takings were "a naked attempt on the part of the state of Hawaii to take the private property of A and transfer it to B solely for B's private use and benefit." *Id.* at 235, 104 S.Ct. 2321. The Supreme Court reversed and upheld the takings, stating:

> The mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose. The Court long ago rejected any literal requirement that condemned property be put into use for the general public. "It is not essential that the entire community, nor even any considerable portion, ... directly enjoy or participate in any improvement in order [for it] to constitute public use."

*Id.* at 243–44, 104 S.Ct. 2321 (quoting *Rindge Co. v. Los Angeles Cnty.,* 262 U.S. 700, 707, 43 S.Ct. 689, 67 L.Ed. 1186 (1923)). The Supreme Court held that, because the taking attacked "certain perceived evils of concentrated property ownership in Hawaii," the taking served a legitimate public purpose despite the

transfer from one private owner to another. *Id.* at 245, 104 S.Ct. 2321.

In *Kelo v. City of New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), the United States Supreme Court again broadly interpreted "public use" and explicitly held that economic development is a legitimate public use under the takings clause of the Fifth Amendment. 545 U.S. at 484, 125 S.Ct. 2655. *Kelo* again noted that the Supreme Court had " 'long ago rejected any literal requirement that the condemned property be put into use for the general public.' " *Id.* at 479, 125 S.Ct. 2655 (quoting *Midkiff,* 467 U.S. at 244, 104 S.Ct. 2321). According to the Court, such a standard was difficult to administer and "proved to be impractical given the diverse and always evolving needs of society." *Id.* The Supreme Court instead "embraced the broader and more natural interpretation of public use as 'public purpose.' " *Id.* at 480, 125 S.Ct. 2655. In *Kelo,* the city of New London, Connecticut, sought to take property as part of an economic development plan. *Id.* at 473–75, 125 S.Ct. 2655. The city presented a detailed development plan that included, among other things, plans to construct a hotel, restaurants, shopping areas, new residences, and office space. *Id.* at 474, 125 S.Ct. 2655. Several residents of the neighborhood contested the taking, arguing that the taking violated the Fifth Amendment because the land would not be taken for public use. *Id.* at 475, 125 S.Ct. 2655. The Supreme Court found that the city, through the redevelopment plan, intended to benefit the community by, among other things, bringing new jobs and increased tax revenue to the area. *Id.* at 483, 125 S.Ct. 2655. In making these findings, the Supreme Court stated, "There is, moreover, no principled way of

---

**7.** In relevant part, the Fifth Amendment provides, "[N]or shall private property be taken for public use, without just compensation."

distinguishing economic development from the other public purposes that we have recognized.... Clearly, there is no basis for exempting economic development from our traditionally broad understanding of public purpose." *Id.* at 484–85, 125 S.Ct. 2655. The Court held that "[b]ecause that plan unquestionably serves a public purpose, the takings challenged here satisfy the public use requirements of the Fifth Amendment." *Id.* at 484, 125 S.Ct. 2655.

■ Missouri's constitutional provisions relating to takings are nearly identical to the federal takings clause embodied in the Fifth Amendment. "While provisions of our state constitution may be construed to provide more expansive protections than comparable federal constitutional provisions, analysis of a section of the federal constitution is strongly persuasive in construing the like section of our state constitution." *Doe v. Phillips*, 194 S.W.3d 833, 841 (Mo. banc 2006) (internal quotations omitted). The Trustees have not argued that this Court should interpret our state constitution's takings provisions any differently from the federal takings clause. This Court, therefore, sees no reason at this point to deviate from the holding of the Supreme Court with regard to the constitutional validity of takings for the purpose of economic development.

■ The Port Authority presented evidence that it intended to take the parcel for economic development purposes. The Port Authority's executive director, Daniel Overbey, testified that the Port Authority wishes to promote growth in employment and commerce through the use of additional rail facilities. To achieve this purpose, it intends to lease the 30.65–acre parcel to private entities so that they can develop the area. Mr. Overbey testified that the prospective tenants will construct a tank farm to store liquids and storage areas for dry and bulk commodities. These storage facilities will be used in the operation of the entities' businesses. The private entities will also provide funding for the construction of the loop track. This in turn, Mr. Overbey testified, will help bring more business to the area and increase employment in the port district. While the 30.65–acre parcel will be directly used by the private entities, the Port Authority's stated purpose of economic development "unquestionably serves a public purpose." This taking, therefore, satisfies the public use requirement of article I, section 28. This Court now turns to whether the taking is valid under § 523.271, which is a very different question than whether the taking is constitutionally valid.

### The Taking Violates § 523.271

The legislature, which is the branch of government elected to determine public policy, made the policy decision to enact § 523.271 to rein in the "public use" of economic development approved in *Kelo*. The statute prohibits the use of eminent domain for solely economic development purposes in Missouri. Section 523.271 provides:

1. No condemning authority shall acquire private property through the process of eminent domain for solely economic development purposes.

2. For the purposes of this section, **"economic development"** shall mean a use of a specific piece of property or properties which would provide an increase in the tax base, tax revenues, employment, and general economic health....

The Trustees argue that the Port Authority's condemnation is solely for economic development purposes in violation of § 523.271. Section 523.271, enacted in 2006, is a relatively recent statute and has yet to be interpreted by this Court or the court of appeals.

■■ At the outset, this Court notes that "solely," as used in the statute, is plain and unambiguous. "It is a basic rule of statutory construction that words should be given their plain and ordinary meaning whenever possible. Courts look elsewhere for interpretation only when the meaning is ambiguous or would lead to an illogical result defeating the purpose of the legislature." *Spradlin v. City of Fulton*, 982 S.W.2d 255, 258 (Mo. banc 1998). Therefore, § 523.271 only prohibits a taking if the sole purpose for the taking is economic development and no other purpose supports the taking.

■ This Court must also interpret the phrase "economic development." For the purposes of § 523.271, the legislature has defined this term. "[T]he lawmaking body's own construction of its language by means of definition of the terms employed should be followed in the interpretation of the statute to which it relates and is intended to apply and supersedes the commonly accepted dictionary or judicial definition and is binding on the courts." *In re Hough's Estate*, 457 S.W.2d 687, 691 (Mo. 1970). An examination of the legislature's definition is, therefore, appropriate. Under the statute, economic development is defined as "use of a specific piece of property or properties which would provide an increase in the tax base, tax revenues, employment, and general economic health." This Court must apply the term "economic development" as defined by the legislature in § 523.271.

■ The legislature's definition presents a curious construction: specifically, the use of the word "and." "When interpreting a statute, this Court must give meaning to every word or phrase of the legislative enactment." *State v. Moore*, 303 S.W.3d 515, 520 (Mo. banc 2010). Unless the context indicates otherwise, "and" means "and." There is nothing in the context of this definition that would suggest that "and" should mean "or." Reading "and" with its ordinary meaning does not lead to an absurd result. Therefore, § 523.271 as written defines "economic development" as an increase in all four of the factors listed in the definition, that is, an increase in "the tax base, tax revenues, employment, *and* general economic health."

■ The next question is: who bears the burden of proving that a taking is not solely for economic development in violation of § 523.271? Under Missouri's public purpose jurisprudence, the condemning authority bears the burden of proving that a particular taking serves a public purpose. *City of Kansas City v. Hon*, 972 S.W.2d 407, 409 (Mo.App.1998); *see also State ex rel. State Highway Comm'n v. Curtis*, 359 Mo. 402, 222 S.W.2d 64, 68 (banc 1949). Likewise, the condemning authority should bear the burden of demonstrating that its taking is not *solely* for economic development purposes in violation of § 523.271 if such a challenge is raised. That means the condemning authority must prove that its taking is not solely to provide an increase in the tax base, tax revenues, employment, *and* general economic health. The condemning authority may do this in any number of ways, including by attempting to prove that the taking does not actually provide an increase in one of the four statutory factors. In this case, the Port Authority did not take that approach. Rather, it sought to prove that, in addition to the economic development purpose, its taking served the purpose of facilitating construction of the loop track. The circuit court believed the Port Authority's evidence and found that the taking served two additional purposes: 1) the taking would facilitate construction of a loop track to handle unit trains to greatly expand and enhance the transpor-

tation facilities at the Port Authority and 2) the taking would improve river commerce. Those findings of the circuit court are supported by the record and in accord with the Port Authority's arguments in this Court and will each be addressed in turn.

The next issue for this Court to determine as a matter of law is whether those factual determinations are purposes in addition to the purpose of economic development. The circuit court's first finding—that the taking would facilitate construction of a loop track—is problematic because the record demonstrates that facilitation of the loop track is one of the means the Port Authority is using to achieve its goal of economic development. Daniel Overbey, the Port Authority's executive director, testified at the condemnation hearing regarding the taking. His testimony concerning the loop track is as follows:

Q. ... Is the port looking to promote growth in jobs and commerce through the use of additional rail facilities?

A. That is correct.

Q. I wonder if you would be kind enough to tell the Court the direction the port would like to go in that manner?

A. Certainly. The port, as you mentioned, owns six-mile railroad, switching railroad, that connects with the Union Pacific and the Burlington Northern Santa Fe. We have the Harbor. We have land around the harbor. Our primary purpose is to move freight....

What we need to do, what we have established as our next objective in terms of general development, is the creation of a loop track. That will allow handling unit trains....

What we have seen over the years is a need to handle unit trains which we cannot do at the present time. Our track is not adequate. It is not large enough to do that. In order to get the lowest rates, the lowest railroad rates are on unit trains, solid trains, entire train load. That would allow combining that with the economic efficiency of barge transportation, which is typically the lowest cost of movement of goods and products there.

Q. And has the port been negotiating with one or more tenants that would facilitate that loop track or a partial loop track?

A. Yes.

Q. Now, we have not entered into a lease with the perspective tenant we are looking at right now. Is that a fair statement?

A. That is correct, yes.

Q. But if that lease falls through we do have other people that are kind of waiting in the wings to negotiate with the port?

A. Yes.

Q. And would that involve the particular industry that we are negotiating with, would that involve them providing the funds to construct a loop track or a partial loop track?

A. Construct the first phase of it. Yes. That is correct.

Q. Which would facilitate movement of freight for the port for existing tenants and future tenants; is that correct?

A. That is correct, yes.

\* \* \*

Q. And the prospective tenant that is going to facilitate construction of a loop track, is in need of further facilities in the port; is that correct?

A. Yes.

Q. Is one of those dry storage for products that can be transloaded from rail to barge?

A. This tenant it is liquid storage is their product.

Q. The other tenants we have negotiated with are for bulk and solid commodities as well?

A. Yes.

Q. And the particular tenant that we have been negotiating for we would have to have this land, the lease with that tenant is conditioned upon acquiring the Lambert parcel; is that correct?

A. Yes.

Q. That parcel would be used by the tenant to construct tanks to handle liquid products to be transloaded from rail to barge or truck to barge?

A. Yes.

Q. Or barge to rail. Is that a fair statement?

A. Yes.

Q. Is our lease with that prospective tenant, again, so we don't have any misunderstanding, is it conditioned upon acquiring the Lambert parcel for those purposes?

A. Yes. The lease that we are discussing that we have in negotiations but is not signed, yes, it includes that.

Q. And would other tenants that are willing to facilitate the loop track also require that type of dry storage?

A. Yes. We·have had several different tenants along those same lines.

Q. Are there other suitable facilities in the port for this dry storage?

A. No.

*    *    *

Q. ... I think you just testified ... that the primary purpose of the port authority is to promote economic devel-

opment for Scott and Cape Girardeau County; is that correct?

A. Yes.

Q. And you do that by attracting industry, attracting business that would like to use the port, rail, truck, as a part of your economic development arm?

A. Yes.

Q. An in connection with the·port authority then the public purpose under which you are condemning the Lambert's property is for economic development, is it not?

A. Yes.

Q. So in connection with this particular condemnation it is for economic development purposes; is that correct? In connection with the lease you are doing. You are in lease negotiations with another company; Is that correct?

A. Yes. It all pertains to river-related commerce, yes.

Mr. Overbey's testimony demonstrates that the Port Authority desires to "promote growth in jobs and commerce through additional rail facilities." The Port Authority wishes to raise the funds to construct the loop track for the explicit purpose of encouraging new business and additional commerce in the port district. The Port Authority wants to condemn the Trustees' land to build the storage facilities so that it can be leased out to prospective tenants who would also provide the initial funding to construct the loop track.[8] "Facilitation of the loop track" in this manner fits within § 523.271's definition of economic development.

▆▆ The facilitation of the loop track, therefore, is not a purpose in addition to economic development, but rather, is in-

---

8. That the land will not be used to actually construct the track raises issues of its own. Primarily, it raises the question of whether land may be condemned for the purpose of

funding a public project to be constructed elsewhere. Because this Court decides this case on other grounds, however, it does not reach this issue.

cluded in the Port Authority's economic development plan. To conclude otherwise would allow any integral part of an economic development plan or project to be considered as a purpose that is separate and distinct from economic development. Reading § 523.271 in this way would render the statute a nullity.

The circuit court's finding that the taking will "improve river commerce" is also problematic. The record demonstrates that the only manner in which the taking will "improve river commerce" is by drawing more economic development into the area. This is opposed to an action that might "improve river commerce" by making such commerce easier to conduct. Such actions might include dredging the river or building canals to allow for better barge access. These are just examples of what appropriately might be considered to "improve river commerce" that would not be included within the legislative definition of economic development. "Improving river commerce" of the sort described in the record, such as increased business and employment that will increase the tax base, tax revenue, employment, and the overall economic health in the port district, is not in addition to economic development.

The record demonstrates that the Port Authority's desire to promote economic development undergirds all of its actions in this condemnation. The Port Authority expressed concerns at oral argument that the interpretation of § 523.271 required by the Court today will render almost any taking "solely" for economic development purposes. Though § 523.271 may make a taking more difficult to effectuate, that difficulty is the *intended* result of the statute, the primary purpose of which was to *limit* the opportunities for which a condemning authority may use the power of eminent domain.

Moreover, the Port Authority has been placed in a particularly difficult position after the passage of § 523.271. Section 68.020 lists the purposes of any port authority organized under chapter 68, RSMo. That section provides:

> It shall be the purposes of every port authority to promote the general welfare, to promote development within the port district, to encourage private capital investment by fostering the creation of industrial facilities and industrial parks within the port district and to endeavor to increase the volume of commerce, and to promote the establishment of a foreign trade zone within the port districts.

This provision essentially makes it the purpose of every port authority to promote economic development within the port district. Mr. Overbey, the executive director of the Port Authority, testified that the primary purpose of the Port Authority was to promote economic development in the port district. The legislature, by enacting § 523.271, made it difficult—if not impossible—for the Port Authority to advance its purposes through the use of eminent domain.

This Court is left with the conclusion that the Port Authority's taking is "for solely economic purposes." Therefore, this Court concludes that the Port Authority's taking violates § 523.271 and is unauthorized by law.

### Conclusion

Economic development "unquestionably serves a public purpose." *Kelo*, 545 U.S. at 484, 125 S.Ct. 2655. Under § 523.271, however, the Missouri General Assembly has determined as a matter of this State's public policy that economic development may not be the *sole* purpose of a taking. The Port Authority failed to demonstrate a purpose that was in addition to economic

development. Because the taking is in excess of the Port Authority's condemnation authority, the taking is unauthorized by law. Prohibition may be appropriate in a condemnation proceeding in which the condemnation proceedings are unauthorized by law. Therefore, the preliminary writ of prohibition is made permanent.

All concur.